Gary Wayne ETHERIDGE, Petitioner,

v.

Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. Civ.A. H–98–3910.

United States District Court,
S.D. Texas,
Houston Division.

May 19, 1999.

Mandy Jo Welch, Burr & Welch, Houston, TX, Jack B. Zimmermann, Zimmermann & Lavine, Houston, TX, Patrick F. McCann, Law Offices of Patrick F. McCann, Houston, TX, Nicholas J. Trenticosta, New Orleans, LA, Terri R. Jacobs, Attorney at Law, Houston, TX, for Gary Wayne Etheridge, petitioner.

Margaret P. Griffey, Office of Attorney General, Austin, TX, Christina Thompson, Office of Atty General, Austin, TX, for Gary Johnson, Director/TDCJ–ID, respondent.

## OPINION AND ORDER

LAKE, District Judge.

Six days after she turned fifteen, Christie Chauviere was robbed, sexually assaulted, and stabbed to death in her home. A jury in the 23rd District Court of Brazoria County found Gary Wayne Etheridge guilty of her capital murder and concluded that he had deliberately killed Christie and that he posed a continuing threat to society. As a result, Etheridge was sentenced to death. Etheridge seeks a writ of habeas corpus from this court, arguing that his conviction and sentence violate the Constitution of the United States. Pending before the court is Respondent, Gary L. Johnson's, Motion for Summary Judgment (Docket Entry No. 16). The court will grant Johnson's motion and dismiss the petition for writ of habeas corpus.

## I. FACTS

### A. Friday, February 2, 1990

Christie Chauviere was the youngest of four children. She and her twenty year-old brother, Charles,[1] lived with their mother, Gail Chauviere, in a two-story house in Lake Jackson, Texas. Christie's father had died in July of 1989. Gail Chauviere described her daughter as a normal fifteen year-old girl. A 4–H member, Christie liked to ride horses. She played sports and enjoyed painting, drawing, and reading. On the night of February 2, 1990, Gail was going to take Christie shopping after work.[2]

Gail Chauviere was a project manager at a townhouse-condominium complex in San Luis Pass. Etheridge had begun working at the complex about a week before the murder. A few days after he began working at the complex, he visited the Chauviere home to pick up a stray dog, Bo, that Gail had found at the complex. Etheridge wanted the dog, and Gail told him to come by and get it.[3]

On February 2 Gail arrived home from work around 5:40 p.m. A dark car sat in her driveway. Gail regularly brought a bag of cash from the apartment complex home with her at the end of the day, and February 2 was no different. As she got out of her car, Bo came running around the vehicle to greet her. At this point she assumed (correctly) that the dark car belonged to Etheridge.[4] Etheridge was already inside when Gail arrived home. He wanted money.[5]

#### 1. *Gail Chauviere's Version of the Attack*

The exact details of what happened next are not absolutely clear. According to Gail's testimony at trial, Etheridge ordered Gail to come into the house with him. She put her purse and the money bag on a chair. Christie, looking upset, was sitting on the arm of a love seat in the den area. Etheridge asked Gail if she was expecting any visitors, to which she replied that her father was coming over. He then asked, "Gail, where is the money? I know you bring it home."[6]

She told him the money was in the bank bag.[7] Petitioner asked, "The money is in there?"

Gail responded, "Yes. Take it; take the money and go. Just take it. I won't tell anybody. Just please don't harm Christie."[8]

As she said this to Etheridge, she reached for her daughter, who was moving off the love seat towards her mother. Just as Gail's fingertips brushed Christie's shoulders, Etheridge jerked Christie to

---

1. Charles had already left for a weekend trip to Austin and was not home when Etheridge murdered his sister. Statement of Facts 661.

2. Statement of Facts 654, 670, 672.

3. Statement of Facts 655, 658.

4. Statement of Facts 660–62.

5. Written Statement of Gary Wayne Etheridge at 2, State's Exhibit 125, Statement of Facts 1134, 1135.

6. Statement of Facts 663–65.

7. Statement of Facts 665.

8. Statement of Facts 666.

him by her hair. Christie screamed. Etheridge told her to shut up and threatened to slit her throat. He then pulled a knife from behind his back and began stabbing Gail. He stabbed Gail two or three times on her left side, then he started striking her head. One blow was so severe that Gail thought she heard an explosion within her head. She blacked out by the fireplace in the den.[9]

At trial Gail only had intermittent memories of what happened after the explosive stab to her head. She remembered being stabbed in the back and in the lower abdomen. She remembered trying to push away from Etheridge and begging him, "No, no. Please don't do this!" She remembered seeing Etheridge hold a knife to Christie's throat and threaten to slit her throat if she did not shut up. She never heard any other intruders in her house and never heard Etheridge speak to anyone other than her and Christie. Etheridge said nothing to indicate that anyone else was there.[10] Gail did not see Etheridge stab Christie.[11]

### 2. *Etheridge's Written Statement*

Etheridge gave a written statement to Brazoria County sheriff's deputies the day of his arrest describing his version of what happened. According to Etheridge, on February 2 his boss, Bob Murray, had given Etheridge the afternoon off and had given him a $50 draw from his paycheck to buy a new car battery. Etheridge used the money to buy drugs. After a few hours of shooting up by himself and with friends at various locations, he drove over to Gail's house.

Gail was not at home when Etheridge arrived at the house. When Etheridge knocked on the door, Christie answered. Etheridge was still on the porch when Gail drove up. As Gail walked to the door, Etheridge told her that he did not have some tax papers she had asked him to

bring her. She walked in the door, and Etheridge followed, closing the door behind them. Christie had been on the telephone when Etheridge knocked, but she hung up when Etheridge and Gail walked in the door. Etheridge then told Gail that he needed some money. Gail, clutching her purse and the money bag, looked worried. Etheridge grabbed for the money bag, causing both women to panic. Etheridge ordered the women to sit on the couch and shut up as he pulled out a knife.

Though hysterical, Gail and Christie complied. Etheridge told them all he wanted was the money. He said, "Gail, I like you, but I have a drug problem, and I have got to have the money," and showed them needle marks on his arms. Gail replied that all he had to do was tell her and she would give him more money.

Etheridge then decided to tie the women up. He told Christie to remove her pants and socks, intending to tie the women up with the pants and gag them with the socks. This did not work, so he decided to tie one woman up with a rope belt and the other with a telephone cord; he did not remember which restraint he used on which woman. The women were still acting hysterical, so petitioner told Christie to stay on the couch while he locked Gail in a closet.

Etheridge took Gail by the arm to the kitchen. Gail grabbed a sharp object, swung around, and cut petitioner on his left index finger. This set him off. He grabbed Gail by the hair and threw her down in the hallway. They fought in what petitioner described as a garden room. Christie began screaming and rushed over to join the fight. Etheridge then recited in his written statement: "The next thing I remember is I was running outside and I had my pocket knife in my hand and it was all bloody...." After his own car would not start, Etheridge took Gail's car and fled.[12]

---

**9.** Statement of Facts 663–68.

**10.** Statement of Facts 668–69, 672.

**11.** Statement of Facts 696.

**12.** Etheridge Statement at 1–2, State's Exhibit 125, Statement 13 of Facts 1134–1135.

## B. Discovery of the Crime Scene

Lorene McCreight, the Chauvieres' next-door neighbor, was the first to suspect something was amiss. She went to the Chauviere home at about 5:50 p.m. to see if Christie could babysit the next evening. She knocked on the door, but no one answered. The lights were on and she could hear the television, so she assumed someone was home. Then she heard a voice cry from inside, "Please help me! Somebody please help me!" She tried to open the front door, but it was locked. She ran home and got her husband, Stan, to come back over with her. They tried the back door, but it was also locked. Through the window, they could see a lamp knocked over.[13] Stan told Lorene to go get his gun. One of the garage doors was open, so they entered the garage. Stan entered the house through a door in the garage. He found Gail, so covered in blood he could not recognize her, in the entrance hall. Then he saw Christie, her hands bound together and her left side pierced several times, lying lifeless on the other side of the hall. The McCreights called the police.[14]

## C. The Injuries to Gail and Christie

John Rhyne, a Richwood police officer,[15] responded to the call. He first discovered Christie, nude from the waist down, lying on her right side in the entrance way. Her hands were tied in front of her with a telephone cord, and she had been gagged with a towel. He saw the remnants of a tear rolling down her cheek. He then saw Gail, moaning for help, lying in an adjacent room.[16] Paramedics took Gail to Brazos-port Memorial Hospital,[17] which transferred her to Hermann Hospital in Houston, where Dr. James H. "Red" Duke treated her. Dr. Duke testified that Gail arrived at Hermann with multiple penetrating wounds to her neck, face, chest, upper abdomen, and arms.[18] She had a severe wound to her right eye, which required reconstructive surgery, and a gaping slash wound to her neck. The neck wound went down to, but did not sever, Gail's internal jugular vein.[19] Gail survived.

Christie was dead at the scene. She suffered four fatal stab wounds—two to her left front chest between 4 and 7 centimeters deep and two more further on the left side of her chest, also about 7 centimeters deep. One of the front-chest wounds pierced her pericardial sac,[20] but not the heart itself, while the other penetrated her ascending thoracic aorta.[21] The two side wounds pierced her left lung and hemidiaphragm. Christie's attacker also stabbed her in the face between her nose and right eye. She also had several defensive wounds on both of her forearms.[22]

Christie's attacker did not confine his assault to Christie's upper body. Christie was nude from the waist down when she died.[23] The gaping condition of her genitals, observed at her autopsy, indicated that something had been inserted into her vagina. Her vulva and both interior vaginal walls were bruised. Her posterior vaginal wall had a 3 centimeter laceration, and she had multiple lacerations around her clitoris. The pathologist who performed Christie's autopsy, Dr. Aurelio A.

---

13. Statement of Facts 40–43.

14. Statement of Facts 63–66, 72–73.

15. The Chauvieres apparently lived just outside the Richwood city limits.

16. Statement of Facts 88, 91–94.

17. Statement of Facts 223–24.

18. Statement of Facts 604–05.

19. Statement of Facts 604–05, 611–12.

20. The pericardium is a membranous sac that contains the heart. *See* Henry Gray, *Anatomy* 457 (T. Pickering Pick & Robert Howden eds., Rev.Am. ed. 19–77).

21. The ascending thoracic aorta carries pure blood away from the left ventricle of the heart for distribution throughout the body. *See id.* at 455, 476.

22. Statement of Facts 330–37.

23. Statement of Facts 91.

Espinola, found no semen in Christie's genitals. He testified, however, that the injuries to her genitals were consistent with knife wounds and concluded that something, possibly a knife or bottle, had been inserted into Christie's vagina while she was still alive.[24]

## D. The Flight and Arrest of Gary Wayne Etheridge

After fleeing the Chauviere home in Gail's car, Etheridge picked up his wife, Theresa, and their baby daughter, Brittany, and two children Theresa was babysitting.[25] They stopped at a bar where Tanya Ray, the mother of the two children, worked and left them with their mother. At the bar Etheridge told Tanya Ray that he had killed a man in a knife fight.[26] Tanya Ray asked Margaret Armbruster, a coworker at the bar, to retrieve Ray's children from the car.[27]

Etheridge then drove with Theresa and Brittany to the home of Charles and Glenda Roenker.[28] Glenda was Theresa's cousin.[29] Glenda remembered Etheridge being covered in blood.[30] Etheridge told the Roenkers that he had just stabbed a man and that he thought the man was dead.[31] Etheridge cleaned up in their bathroom, dressed a cut on his finger, and left with Theresa and Brittany.[32] About a halfhour later, they returned, asking the Roenkers to take care of Brittany. Etheridge and Theresa then left again.[33]

Etheridge abandoned his wife in Mobile, Alabama. After wrecking Gail's car there, he hitchhiked back to Texas.[34] On February 7, 1990, Paul Day, an off-duty Houston police officer spotted Etheridge walking along Highway 288, arrested him, and warned him of his rights. When officer Day asked Etheridge if he knew why he was under arrest, Etheridge responded, "Yes, I know I'm under arrest for killing that fifteen year-old girl. I'm sorry for what I did, and I was going back to Brazoria County to turn myself in."[35]

Officer Day took Etheridge to the Brazoria County Courthouse and turned him over to the Brazoria County Sheriff's Department.[36] A Justice of the Peace read Etheridge his rights and had him sign a document confirming that he had received the warning.[37] Though told that he had a right to have a lawyer present during questioning, Etheridge did not request one.[38] Etheridge then spent four hours answering questions from officers Ollie Falks and Gary Stroud and drafting the written statement summarized above. Officer Falks typed the statement as Etheridge narrated, but he gave Etheridge the opportunity to make changes to the draft. Etheridge signed each page of the statement.[39]

The next day, February 8, 1990, officers Stroud and Moore conducted another interview with Etheridge, which they recorded. Etheridge denied raping Christie and

---

24. Statement of Facts 339–42.

25. Etheridge Statement at 2, State's Exhibit 125, Statement of Facts 1135.

26. Statement of Facts 365–67.

27. Statement of Facts 377, 385.

28. Etheridge Statement at 2, State's Exhibit 125, Statement of Facts 1135.

29. Statement of Facts 387.

30. Statement of Facts 410.

31. Statement of Facts 397, 413.

32. Statement of Facts 398–99, 415–16.

33. Statement of Facts 401.

34. Etheridge Statement at 3, Exhibit 125, Statement of Facts 1136.

35. Statement of Facts 627, 631–36. For a discussion of the admissibility of this statement, see Part VI.

36. Statement of Facts 639.

37. Statement of Facts 82–83; Magistrate's Warning, State's Exhibit 124, Statement of Facts 1133.

38. Statement of Facts 83.

39. Statement of Facts 114–17; Etheridge Statement at 1–3, State's Exhibit 125, 1134–36.

said he could not remember stabbing either woman. He did say unequivocally, "I killed a girl." He also said that no one came with him to the Chauviere's house, that he went there alone, and that he could prove it because someone across the street saw him arrive and leave.[40] Indeed, Joe Juarez, who lived across the street from the Chauvieres, saw Gail's car pull out of the driveway and drive towards him. Juarez saw only one person in the car.[41]

After the taped interview on February 8, the officers allowed Etheridge to speak to his father on the telephone. Etheridge knew the officers were recording the call.[42] Etheridge denied raping Christie. Etheridge told his father to tell anyone that harassed his family that Etheridge killed Christie, not the family. Etheridge declared that he wanted to talk to the press so that he could tell them that he killed the girl.[43]

## II. *PROCEDURAL HISTORY*

On April 3, 1990, a Brazoria County Grand Jury returned a one-count, four-paragraph indictment against Etheridge alleging the capital murder of Christie Chauviere.[44] Specifically, the indictment alleged that Etheridge murdered Christie while in the course of robbing her, sexually assaulting her, kidnapping her, and robbing her mother. The indictment also included four enhancement paragraphs alleging prior felony convictions for theft, burglary, and aggravated assault.[45]

Voir dire, which began on October 8, 1990, ended on October 26, and the trial began on October 31, 1990. The jury found Etheridge guilty of capital murder on November 6, 1990.[46] The penalty phase began the next day, and on November 8, 1990, the jury answered "yes" to the two special issues presented to it.[47] After accepting the jury's verdict, the trial court adjudged Etheridge guilty of capital murder and sentenced him to death.[48]

Etheridge filed a motion for new trial on December 10, 1990.[49] The court held a hearing and denied the motion on January 21, 1991. The next day Etheridge filed a notice of appeal.[50] The Court of Criminal Appeals affirmed his conviction and sentence on June 22, 1994, and denied his motion for rehearing on May 10, 1995. *See Etheridge v. State,* 903 S.W.2d 1 (Tex. Crim.App.1994). It issued its mandate on August 11, 1995. The United States Supreme Court denied certiorari on October 10, 1995. *See Etheridge v. Texas,* 516 U.S. 920, 116 S.Ct. 314, 133 L.Ed.2d 217 (1995).

On April 23, 1997, Etheridge filed his Original Application for Writ of Habeas Corpus in the state courts.[51] He amended his application two months later on June 18, 1997.[52] The state district court entered findings of fact and conclusions of law on January 6, 1998.[53] The Court of Criminal

---

**40.** Statement of Facts 156, 168.

**41.** Statement of Facts 351. Juarez testified that the driver had light-colored hair. Etheridge alleges that his hair was dark brown on February 2, 1990.

**42.** Statement of Facts 589.

**43.** Statement of Facts 579, 586.

**44.** Under Tex.Pen.Code Ann. § 19.03(a)(2), murder in the course of *inter alia* actual or attempted robbery, kidnapping, or aggravated sexual assault is classified as capital murder.

**45.** Indictment, Transcript at 9–10.

**46.** Verdict, Transcript at 262.

**47.** Verdict, Transcript at 271–73.

**48.** Judgment, Transcript at 274–79.

**49.** Transcript at 282.

**50.** Transcript at 293.

**51.** *See* Original Application at 1, *Ex Parte Etheridge,* No. 36, 433–01, at 9 (Tex.Crim.App. Apr. 1, 1998).

**52.** *See* First Amended Application at 1, *id.* at 31.

**53.** *See* Findings of Fact and Conclusions of Law, *id.* at 267. Typically, the same state court that tried a habeas applicant's criminal case will review the subsequent habeas application. However, the judge who tried Etheridge's capital murder case recused from the habeas proceedings, so a different state district court reviewed the state application and entered findings of fact and conclusions of

Appeals subsequently denied Etheridge's state application *per curiam* on April 1, 1998.[54] Etheridge filed a motion for reconsideration on April 13, 1998; the court denied it that same day.

On November 13, 1998, Etheridge filed a Petition for Writ of Habeas Corpus and Request for Evidentiary Hearing in this court. He raises the following specific claims:

(1) he is actually innocent and did not kill Christie Chauviere;

(2) he is actually innocent of the death penalty;

(3) the punishment-phase jury instructions failed to allow the jury to consider and give effect to mitigating evidence;

(4) he received ineffective assistance of counsel at his sentencing hearing because

(a) the sentencing mechanism did not allow his attorneys to present mitigating evidence;

(b) his attorneys failed to make a bill of exceptions on petitioner's mitigating evidence;

(c) his attorney's did not request a jury instruction on mitigating evidence; and

(d) his attorneys advised him not to testify regarding his mitigating evidence at the hearing; and

(5) the trial court failed to suppress the custodial statement that he made to officer Day.

Etheridge also requests an evidentiary hearing. On February 11, 1999, Johnson filed his Amended Answer and Motion for Summary Judgment. Johnson alleges that Etheridge has failed to exhaust his actual innocence and ineffective assistance of counsel claims and argues that they are procedurally barred because the state courts would dismiss these claims for

abuse of the writ. Johnson also argues that these, as well as Etheridge's remaining claims, fail on the merits.

Etheridge's claims and Johnson's summary judgment argument fall into five broad issues for review:

(1) application of the procedural bar doctrine;

(2) Etheridge's alleged actual innocence;

(3) the admissibility of the custodial statement;

(4) the adequacy of the sentencing process for considering mitigating evidence;[55] and

(5) the need for an evidentiary hearing.

## III. *STANDARD OF REVIEW*

Because Etheridge filed his federal petition for writ of habeas corpus on November 13, 1998, it is subject to review under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214. *See Nobles v. Johnson,* 127 F.3d 409, 415 (5th Cir.1997) (holding that AEDPA applies to capital cases filed after its effective date, April 24, 1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998). Under AEDPA the court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court decision

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

law. *See Ex Parte Etheridge,* No. 36,443–01 at 30, 123, 267–75.

54. *See id.* at cover.

55. All of Etheridge's ineffective assistance of counsel claims as well as his inadequate jury instruction claim revolve around the sufficiency of the sentencing hearing for allowing consideration of mitigating evidence.

28 U.S.C. § 2254(d) (West Supp.1999). Further, in review of a state prisoner's federal habeas petition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

## IV. *PROCEDURAL BAR*

■ Johnson argues that each of Etheridge's actual innocence claims and all of his ineffective assistance of counsel claims are procedurally barred because he has not fairly presented them to the state courts, and, were he to do so now, the state courts would dismiss them for abuse of the writ. *See* Tex.Code Crim.Proc.Ann. art. 11.071, § 5 (Vernon Supp.1999). Under the Supreme Court's decision in *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991), "if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[, then] there is procedural default for purposes of federal habeas." Under Texas statutory abuse of the writ doctrine, Texas courts generally may not even consider, much less grant relief on, claims made in subsequent applications for habeas corpus. *See* Tex.Code Crim.Proc.Ann. art. 11.071, § 5(a) (Vernon Supp.1999).

■ Etheridge raised a claim of actual innocence and a claim of ineffective assistance of counsel in his state habeas application.[56] Johnson argues that because the theories underlying the claims Etheridge made in state court were different than those supporting his federal claims, Etheridge has not fairly presented the pending actual innocence and ineffective assistance claims to the Texas courts as required by the exhaustion and procedural bar doctrines. *See Nobles v. Johnson*, 127 F.3d 409, 420–22 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998). The court agrees.

In his state habeas application Etheridge alleged that his trial counsel rendered ineffective assistance of counsel by not using all of his peremptory strikes during voir dire.[57] This was the sole basis for his state ineffective assistance claim. Here, Etheridge raises four claims of ineffective assistance of counsel, all of which challenge his trial counsels' decisions regarding the jury instructions and evidence of mitigation at the punishment phase of his trial. None of his pending ineffective assistance claims address his trial counsels' conduct at voir dire. Because Etheridge has "advance[d] in federal court an argument based on a legal theory distinct from that relied upon in state court," he has failed to satisfy the exhaustion requirement. *Nobles*, 127 F.3d at 422 (quoting *Vela v. Estelle*, 708 F.2d 954, 958 n. 5 (5th Cir.1983)).

Similarly, Etheridge did not fairly present his pending actual innocence claims to the state courts.[58] In his state habeas application, Etheridge pointed to evidence excluded by the trial court that someone named Eddie or "Queer" Eddie went with Etheridge to the Chauviere house on February 2, 1990.[59] He also alleged that analysis of blood evidence collected at the house admitted at trial showed that a fourth person was present with Etheridge, Christie, and Gail.[60] Given these circumstances, Etheridge argued that "the presence of an unidentified person could have led the jury to a belief that the Applicant

---

**56.** *See* First Amended Application, *Ex Parte Etheridge*, No. 36,443–01 at 34–35.

**57.** *See* First Amended Application, *Ex Parte Etheridge*, No. 36,443–01 at 51–52.

**58.** As explained below, an independent, substantive actual innocence claim does not state a claim for habeas relief. *See infra* subpart V.A. The court will assume that a substantive actual innocence claim is cognizable *solely* for the purposes of analyzing Johnson's procedural bar defense.

**59.** *See* First Amended Application, *Ex Parte Etheridge*, No. 36,443–01 at 48.

**60.** *See id.* at 49–50.

was not guilty of the crime as charged, in that he might not have been guilty of the death of Christine [*sic*] Chauviere during the course of any of the crime as charged in his capital indictment." [61]

Pointing to the blood analysis and other evidence, Etheridge alleges in his federal petition that someone was with him when he went to the Chauvieres' house. This time, however, he accuses his brother, Mike Etheridge, of accompanying him and alleges that Mike actually raped and stabbed Christie to death. Etheridge claims that he confined his attack to Gail.[62] Based on this allegation, Etheridge contends that he could not have been guilty of capital murder because he did not cause Christie's death or intend that she die. Similarly, Etheridge argues that he is actually innocent of the death penalty because any deliberateness on the part of the real killer cannot be imputed to Etheridge.[63]

Etheridge has presented an actual innocence theory distinct from the one that he presented in the state courts. His state application argued that the *possible* presence of another person, combined with some of the blood evidence presented at trial, would have prevented the jury from finding petitioner guilty of capital murder. His theory was that there was a reasonable doubt whether he killed Christie because someone else might have been there. While he alleged that there could have been a second man at the scene, he did not accuse that man of actually killing Christie, let alone identify his brother as the real killer. Here, Etheridge alleges that some-

one else actually committed the murder, that Etheridge had no intention of killing Christie, and that he did not have the requisite deliberateness to support a death sentence. The court concludes that Etheridge has not fairly presented this innocence theory to the state courts and has therefore failed to exhaust this claim.

█ Because Etheridge failed to raise his present actual innocence and ineffective assistance of counsel claims in his initial state habeas application, the Texas Court of Criminal Appeals would find these claims procedurally barred under the abuse of the writ doctrine. *See* Tex.Code Crim.Proc.Ann. art. 11.071, § 5 (Vernon Supp.1999). To avoid dismissal of these claims Etheridge must therefore establish that this court's failure to consider their merits would constitute a miscarriage of justice.[64] *See Meanes v. Johnson*, 138 F.3d 1007, 1013 (5th Cir.), *cert. denied*, — U.S. —, 119 S.Ct. 417, 142 L.Ed.2d 338 (1998). The miscarriage of justice exception is limited to claims of actual innocence. *See Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 2518–19, 120 L.Ed.2d 269 (1992).

## V. *ACTUAL INNOCENCE*

Etheridge claims that he did not kill Christie Chauviere. He now blames his brother, Mike Etheridge, for her death. Based on these allegations, Etheridge seeks habeas relief from his conviction and his sentence and avoidance of dismissal of his procedurally barred claims under the miscarriage of justice exception. Johnson

61. *Id.* at 51.

62. Petition for Writ of Habeas Corpus [Docket Entry No. 7] at 3–4; November 10, 1998, Affidavit of Gary Wayne Etheridge at 1–2, Exhibits to Petition for Writ of Habeas Corpus [Docket Entry No. 8], Exhibit C.

63. Petition for Writ of Habeas Corpus [Docket Entry No. 7] at 15–19.

64. Alternatively, habeas petitioners may also avoid dismissal of procedurally barred or defaulted claims by establishing cause and prej-

udice. *See Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.1995) (*per curiam*). To the extent that Etheridge relies on the ineffectiveness of his state habeas counsel as cause for his default, such an argument is foreclosed by *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2566, 2568, 115 L.Ed.2d 640 (1991) (holding that attorney error that leads to default of a federal habeas claim is not sufficient cause). *See Callins v. Johnson*, 89 F.3d 210, 212 (5th Cir.1996) ("[N]o error by habeas counsel can ever constitute cause for abusing the writ."). The court will therefore not conduct a cause and prejudice analysis.

contends that actual innocence will not support habeas relief and that Etheridge has not established his innocence. The court agrees.

## A. Etheridge's Substantive Actual Innocence Claim

■ A substantive claim, standing on its own, that execution of an innocent person would violate the Eighth Amendment's Cruel and Unusual Punishment Clause does not state a claim for relief under § 2254. *See Lucas v. Johnson,* 132 F.3d 1069, 1075 (5th Cir.), *pet. for cert. dism'd,* —— U.S. ——, 119 S.Ct. 4, 141 L.Ed.2d 765 (1998); *Jacobs v. Scott,* 31 F.3d 1319, 1324 (5th Cir.1994); *see also Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 862–63, 122 L.Ed.2d 203 (1993) (noting that the Supreme Court has never recognized actual innocence as an independent basis for granting a writ of habeas corpus). Instead, claims of actual innocence, when proven, permit a federal court to examine the merits of other, independent habeas claims that would otherwise not be reviewable because of procedural infirmities. *See Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 861, 130 L.Ed.2d 808 (1995); *Jacobs,* 31 F.3d at 1325.[65] Etheridge's claim for relief from his conviction and sentence on his independent, substantive claim that he did not commit Christie's murder therefore fails to state a habeas claim. For this reason, and because it is procedurally barred, the court will dismiss petitioner's substantive, independent claim of actual innocence.[66]

## B. Etheridge's Procedural Actual Innocence Claim

Etheridge also treats his actual innocence claim as a procedural claim to avoid application of a procedural bar to his ineffective assistance claims. Etheridge asks the court to consider his barred ineffective assistance claims because he is innocent and because failure to consider the constitutional claims of an innocent person would constitute a miscarriage of justice.

### 1. The Burden of Proof

■ Once convicted, a defendant is presumed guilty. *See Herrera,* 113 S.Ct. at 860. The level of proof required to rebut depends upon the nature of the procedural innocence claim the petitioner raises. When a petitioner challenges the underlying conviction he must show that it is *more likely than not* that no reasonable juror would have found him guilty beyond a reasonable doubt. *See Schlup,* 115 S.Ct. at 867; *Lucas,* 132 F.3d at 1077. When a petitioner challenges his death sentence in particular and claims he is "actually innocent of the death penalty," a higher level of proof is required. *See Calderon v. Thompson,* 523 U.S. 538, 118 S.Ct. 1489, 1503, 140 L.Ed.2d 728 (1998) (explaining the various types of procedural actual innocence claims and the level of proof required to prevail on each). When raising

---

**65.** The Court in *Herrera* stated, in the alternative, that even if substantive actual innocence claims by themselves were legally cognizable, they would require an "extraordinarily high" showing of evidence to justify relief. *See Herrera,* 113 S.Ct. at 869. The Fifth Circuit has read this portion of the *Herrera* decision as *dicta* and held that *Herrera* did not recognize a substantive actual innocence claim or bring into question the firm precedent that substantive claims of actual innocence do not state a claim on collateral review. *See Robison v. Johnson,* 151 F.3d 256, 267 (5th Cir. 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Lucas,* 132 F.3d at 1075.

**66.** Even if a substantive, independent claim of actual innocence were generally available to habeas petitioners and not procedurally barred in this case, Etheridge would not prevail. Such a hypothetical ground for relief would require an "extraordinarily high" showing of innocence. *See Herrera,* 113 S.Ct. at 869. As explained below, *see infra* subpart V.B.3, Etheridge cannot even meet the less stringent preponderance standard required for his procedural innocence claim. Having failed to meet the lower preponderance standard, Etheridge necessarily cannot meet the extraordinarily high burden required to prevail on a hypothetically available substantive actual innocence claim.

an actual-innocence-of-the-death-penalty claim, a petitioner must show by *clear and convincing evidence* that but for the alleged constitutional error—the separate habeas claim—no reasonable juror would have found the petitioner eligible for the death penalty. *See id.; Jacobs,* 31 F.3d at 1325 (quoting *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269 (1992)) Etheridge asserts both types of actual innocence claims.

Etheridge admitted in his closing arguments at trial that he was guilty of aggravated robbery.[67] He admits now that he was at the scene of the crime when the robbery and murder occurred. Etheridge simply denies that he killed Christie or that he intended for her to die.[68] Because he challenges his guilt of the underlying crime, the more-likely-than-not standard governs.

▮ Etheridge also claims that he is actually innocent of the death penalty. Under the law of the parties doctrine, a defendant is criminally liable for a crime committed by another if he acted with intent to assist the actual perpetrator. *See* Tex.Penal Code Ann. § 7.02 (Vernon Supp.1999). The law of the parties does not apply, however, at the sentencing phase in capital murder trials. At the sentencing phase the jury must find that the defendant acted deliberately and with the expectation that death would result. *Green v. State,* 682 S.W.2d 271, 287 (Tex. Crim.App.1984), *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794 (1985). Etheridge argues that because he did not act with the intent or expectation that Mike Etheridge would kill Christie, he did not act deliberately and therefore should have only received a life sentence.

This second innocence claim is a challenge to Etheridge's sentence. Specifically, he is contesting a sentence enhancer—whether he acted deliberately. The level of proof for his actual-innocence-of-the-

death-penalty claim, therefore, is the more stringent clear and convincing evidence standard. *See Calderon,* 118 S.Ct. at 1503. Although Etheridge argues that the preponderance standard should apply to both of his actual innocence claims, the court concludes that the preponderance standard applies to his challenge to the conviction ("I did not kill her"), but the clear-and-convincing evidence standard applies to his challenge to the sentence ("I did not act deliberately").

### 2. Etheridge's Theory of Innocence

#### a. Etheridge's Affidavit

Etheridge submitted a sworn affidavit with his federal petition alleging that he did not kill Christie, that his brother, Mike, went with him to the Chauviere home and actually killed her, and that Etheridge had no intention that Christie die. The relevant part of his affidavit states:

On February 2, 1990, my brother Mike Etheridge and I went to the home of Gail Chauviere in Richwood, Texas. I had been working for Gail, and knew where she lived because she had given me a dog, which I picked up from her house before that date. Mike had never met Gail before.

On February 2, Mike and I had been using cocaine and heroin, and we needed more money for drugs. All we wanted was to get some money from Gail. I never intended to hurt anyone. Mike never said to me he wanted to hurt anyone. When we got inside the house, I asked Gail for an advance on my paycheck, but Gail refused to give me any money. I told her to be quiet, that I only wanted the money. We struggled, and I tried to calm her down and put her in the closet so we could take the money and go. I did stab Gail with a small pocketknife that I kept in my pocket for work. She grabbed something sharp

---

67. Statement of Facts 842.

68. Petition for Writ of Habeas Corpus [Docket Entry No. 7] at 3–4, 15; Affidavit of Gary

Wayne Etheridge at 1, Exhibits to Petition for Writ of Habeas Corpus [Docket Entry No. 8], Exhibit C.

from the kitchen and cut me on the left hand.

Meanwhile, her daughter, Christie Chauviere, had come out of the bathroom and became hysterical and was screaming. Mike tried to get her to be quiet. They were in a different part of the house from where Gail and I were. I was near the kitchen with Gail and Mike was in the front entrance way with Christie. I could hear Christie yelling, but I was having a hard time trying to get Gail to quit fighting me. I am sorry that I stabbed Gail. I had not gone there intending to hurt her, and I have regretted hurting and cutting her all these years. I then heard Christie stop making noise. I did not see Mike stab Christie. I did not stab or cut or hurt or have any sexual contact with Christie in any way.

Once I freed myself from Gail and heard Christie was quiet, I saw Mike standing over Christie in the entrance way. Mike and I then left through the door into the garage. I was bleeding from the cut on my hand. My car would not start, so Mike and I got in Gail's car. I saw a neighbor by his mail box, and I ducked down.... My hair is not light. On the day of the offense, it was dark brown. On the day of the offense, Mike's hair was blonde. We look very much alike.

I told the police that there was another man with me when I made a statement on April 2, 1990. I did not tell anyone that it was my brother Mike Etheridge with me, because I have never snitched on anyone in my life. Besides, it was my idea to go get money from Gail. I do not know why Mike killed Christie.[69]

### b. Corroborating Evidence

Etheridge cites various evidence as corroboration for his affidavit that a second assailant accompanied him to the Chauvieres' home.

### (1) The car doors

Gail Chauviere testified that when she returned home Etheridge's car was parked on the left side of her driveway.[70] She said that the driver's side door was completely open, while the passenger door was partially open.[71] Etheridge questions why both car doors would be open if he had driven there alone. No other witnesses testified that both car doors were open. Gail had undergone severe trauma and still did not remember all of the events of that evening.[72] Gail also testified that Etheridge's dog, Bo, greeted her in the driveway. It is possible that Etheridge brought Bo with him and had opened the passenger door to let the dog out of the car. Other witnesses and photographs of the crime scene indicate that Etheridge's car was on the right side of the driveway, not the left as described by Gail.[73] It is not surprising that Gail did not accurately remember the less significant details of the condition and configuration of her driveway given the vicious attack she suffered moments later inside her house. Gail testified that she never saw petitioner actually stab Christie. She did, however, hear him threaten to slash Christie's throat.[74]

### (2) The blood analysis

Etheridge also points to the blood evidence collected at the scene in support of his contention that he was not alone. Holly Hammond, a forensic DNA analyst, performed DNA typing[75] on blood taken from

---

69. Etheridge Affidavit at 1–2, Exhibits to Petition for Writ of Habeas Corpus [Docket Entry No. 8], Exhibit C.

70. Statement of Facts 693–94.

71. Statement of Facts 662.

72. Statement of Facts 669–70.

73. Statement of Facts 67; State's Exhibits 1–2, Statement of Facts 1010, 1011.

74. Statement of Facts 669.

75. DNA typing is a sophisticated means of comparing the DNA of unknown blood samples to that of known blood samples in order to differentiate possible donors of the unknown blood. Statement of Facts 531.

Gail's purse, from Christie's shirt, from a piece of Kleenex found on a doorknob, and from a piece of Kleenex found in the garage. Etheridge's DNA matched four out of four probes with the unknown samples taken from the two Kleenexes and Gail's purse. Based on genetic databases at Baylor College of Medicine and the FBI, Hammond estimated that the particular DNA pattern in those samples occurred in about one out of every 60–80 million people. However, she came to a lower estimate for the blood found on Christie's shirt. Hammond testified that there was less DNA available for analysis in that sample. Etheridge's DNA matched the shirt sample, but only at one out of the four probes. This matched pattern occurs in one out of every 88–90 people, a frequency of 1.1%.[76] The statistical probability that someone other than Etheridge might have contributed the blood to Christie's shirt is thus much higher than that for the blood on the Kleenexes and Gail's purse.

The DNA evidence was not the only blood evidence linking Etheridge to Christie's murder. Janet MacDonald, a serologist at the Brazoria County Sheriff's Department, conducted a regular "ABO" blood analysis. Both Gail and Christie had type A2 blood. Etheridge had type O.[77] Two samples of blood from Christie's shirt were type O. Four other samples from the shirt tested positive for the H-antigen, which indicates type O blood.[78] Hammond testified that there was not enough DNA material available to get a four-for-four match on the DNA comparison of the shirt sample. With the material she had, Etheridge's DNA did match one of the four probes. The DNA pattern occurs in only 1.1% of the population. Moreover, type O blood was found on Christie's shirt, and petitioner has type O blood.

Moreover, Etheridge has not offered any evidence that Mike left any of his own blood at the scene. There is no evidence that Mike, if he even was there, was bleeding. Etheridge does not allege that Gail or Christie drew Mike's blood while allegedly struggling with him. He does not indicate that Mike might have accidentally slashed himself during the assault, and he does not allege that Mike suffered any injuries, bloody or otherwise, that might have left his DNA on Christie's shirt. There is no evidence indicating what Mike's blood type is. Etheridge's criticism of the DNA results casts little doubt on his guilt. The standard ABO blood typing as well as the DNA analysis were presented at trial. Etheridge simply offers an alternative inference to draw from the record. "[A] federal court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and [the court] must defer to that resolution." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2793, 61 L.Ed.2d 560 (1979).

### (3) Was there more than one knife?

Etheridge next points out that Dr. Espinola, the medical examiner who performed Christie's autopsy, testified that it was possible that different knives caused Gail and Christie's wounds. He also testified, however, that the same knife could have caused both women's wounds.[79] Gail's trauma physician at Hermann Hospital, Dr. Duke, testified that Gail and Christie had wounds of similar size. He admitted that he could not say the same knife caused them all.[80] This testimony was presented at trial. Etheridge offers no *new* evidence that different knives caused the injuries.

### (4) Blood trails

Etheridge finds it significant that in light of all of the blood spilled in the attack

---

**76.** Statement of Facts 530–37.

**77.** Statement of Facts 444–45.

**78.** Statement of Facts 469–70.

**79.** Statement of Facts 343–44.

**80.** Statement of Facts 623.

there was no blood trail leading from one victim to the other. Gail and Christie were discovered in different areas of the house. Christie lay in the front entrance hallway, while Gail was sprawled on the floor of an adjoining room. Etheridge first argues that it is unlikely that one person could inflict such bloody injuries to two separate people in two different rooms of the house. However, Gail testified that soon after Etheridge began stabbing her, she blacked out. Having incapacitated Gail, Etheridge could have turned his assault to Christie.

Etheridge also suggests that had only one attacker stabbed both women, there should have been a blood trail tracing his path between them, yet there was no trail of blood between the women. Etheridge argues that this supports his claim that he had an accomplice who actually killed Christie. This argument proves nothing. Under Etheridge's reasoning, separate attackers should have left separate blood trails. There appears to have been a trail of blood drops leading from Christie out of the house. (Lying in the entrance way, Christie was closer to the garage door—the exit Etheridge used—than Gail.) MacDonald's analysis showed that this blood could have been Etheridge's, Christie's, Gail's, or a mixture thereof.[81] Yet, there is no blood trail leading away from where Gail was lying. Etheridge says he attacked Gail and suffered a wound to his hand in the process, while Mike attacked Christie. Although Etheridge was admittedly bleeding, he offers no evidence of a trail of his or Gail's blood leading away from Gail. Etheridge's own version of events, in which he allegedly only attacked Gail while Mike attacked Christie, thus shows that he could have traveled through part of the house without leaving a blood trail.

### (5) Gail's failure to identify her attacker

Etheridge points out that Gail could not identify her attacker at the scene. Officer Rhyne testified that when he asked Gail who had attacked her, "she replied very sharply after a pause that she didn't know."[82] When he asked her if "they were still here," she paused and then said she did not know.[83] Etheridge apparently believes this dialogue supports his contention that he is innocent or had a companion attacker. At trial Gail could only remember bits and pieces of the events occurring between the blow to her head and awaking at Hermann Hospital. She did not remember riding in an ambulance or being treated at Brazosport Hospital. She did not remember identifying Etheridge as her assailant in a single-photo lineup at Brazosport Hospital.[84] She did, however, remember picking Etheridge's picture out of a multi-photo lineup at Hermann Hospital and identifying him as the assailant.[85]

Gail was lying in her own blood in her home just minutes after the assault when officer Rhyne, still uncertain whether the assailant was in the house, asked her who attacked her. It is not surprising that she did not immediately identify Etheridge—a man she had known for about a week—by name. She did, however, twice identify Etheridge as her attacker from pictures at Brazosport and Hermann Hospitals. A jury could easily have concluded that, while Gail did not immediately remember Etheridge's name, she certainly could remember the face of the man who repeatedly stabbed her. Etheridge simply tries to draw an alternative, and unpersuasive, inference from the evidence submitted to the jury.

### (6) Hair color

Joe Juarez, a neighbor of the Chauvieres, saw someone with light-colored or

81. Statement of Facts 464–67.

82. Statement of Facts 94.

83. Statement of Facts 94.

84. Statement of Facts 669–70, 677.

85. Statement of Facts 677.

blond hair driving away from the Chauviere house that night.[86] Etheridge alleges that on the night of the murder, his hair was brown, but Mike's hair was blond. Etheridge alleges that Juarez actually saw Mike. However, Juarez saw only one person in the car.[87] Moreover, MacDonald testified that the hair samples she took from petitioner after his arrest showed that his hair had recently been dyed black.[88] In his written statement, petitioner admitted that he dyed his hair black after the attack when he and Theresa arrived in Mobile, Alabama.[89] Etheridge offers no evidence other than his unsubstantiated affidavit that his hair was brown on February 2, 1990, or that Mike's hair was blond. There is no physical evidence placing Mike in Gail's car that night. Juarez testified that the driver's hair color was blond and that there was only one person in the car. The jury heard this evidence and found Etheridge guilty of murdering Christie. The court will not draw an alternative inference.

### (7) Mike's propensity for violence and sexual assault

Finally, Etheridge alleges that Mike has a history of violent criminal behavior and sexual deviancy, while Etheridge's criminal record consists primarily of property offenses and no sex offenses. Between the two of them, Etheridge thus alleges that Mike was more likely disposed to mutilating a woman's genitalia, as was done to Christie, than Etheridge was. Etheridge does not mention his own prior conviction for aggravated assault, which occurred after he stabbed a fellow inmate near the heart.[90] Etheridge had experience in stabbing people and his own violent propensities are not as benign, compared to Mike's, as he contends.

### 3. Review of the Evidence

■ When reviewing procedural actual innocence claims the court is not limited to the evidence admitted at the trial:

> The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." [91]

In fact, to make a credible showing a petitioner must support his claim with fresh, reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was *not* presented at the trial. *See Schlup*, 115 S.Ct. at 865. However, other than his affidavit and documents establishing Mike's criminal record, Etheridge simply offers alternative inferences, which he attempts to draw from the evidence presented at his trial, that he was not alone at the house.

Etheridge did make a self-serving tape-recorded statement to law enforcement on April 2, 1990, in which he alleged that an individual named Eddie or Queer Eddie accompanied him to the Chauviere house.[92] He would not disclose Eddie's last name or his address to the officers. Etheridge also said that Eddie was in the car with him and Theresa until shortly before they arrived at the Roenkers' home.[93] However,

---

86. Statement of Facts 351, 354.

87. Statement of Facts 354.

88. Statement of Facts 508.

89. Etheridge Statement at 3, State's Exhibit 125, Statement of Facts 1134, 1136.

90. Statement of Facts 939, 943, 947.

91. *Schlup*, 115 S.Ct. at 867 (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi. L.Rev. 142, 160 (1970)); *accord Lucas*, 132 F.3d at 1077.

92. When Etheridge attempted to play the tape of his statement at trial, the court sustained the State's hearsay objection. Statement of Facts 736.

93. Statement of Facts 711–29.

Margaret Armbruster, who retrieved Tanya Ray's children from the car when Theresa and Etheridge dropped them off at the bar, testified that she did not see anyone other than Theresa, Brittany, and Ray's two children in the car.[94]

Arrayed against Etheridge's unpersuasive inferences drawn from the trial evidence is the evidence of his guilt: the myriad samples of type O blood found at the scene, Gail's identification of Etheridge as her assailant and her testimony that he was alone, and the numerous inculpatory statements Etheridge made. On the evening of the murder he told Tanya Ray and the Roenkers that he had committed murder.[95] Five days later he admitted to his arresting officer that he had killed Christie.[96] That same day he signed a statement admitting that he went to the house alone and attacked both women.[97] In a taped interview with police the next day he stated that he went to the house alone and that he killed Christie.[98] After the interview, he spoke on the telephone with his father and said if he could talk to the press he would tell them that he had committed the crime.[99] He said he did not want his baby·daughter, Brittany, to know that her father was a killer.[100]

■ Etheridge has not offered any new, *reliable* evidence not presented at trial to exculpate himself. His self-serving affidavit, filed eight years after the crime, contradicts several inculpatory statements he made within hours of his arrest. His story keeps changing. He certainly has not established his own reliability, and he has not corroborated any of the new alle-

gations in his affidavit with documentary,[101] photographic, or physical evidence. In the end, Etheridge basically urges the court to favor alternative inferences he draws from the evidence presented to the jury. This is not sufficient to overcome the presumption of guilt that attached upon his conviction. Whether by preponderance or by clear and convincing evidence Etheridge has not met the burden imposed on procedural actual innocence claims to show that no reasonable juror would have found him guilty beyond a reasonable doubt.

Because Etheridge has failed to establish his innocence, he cannot show that a miscarriage of justice will result from the dismissal of his procedurally barred claims. To the extent that a stand-alone claim of actual innocence could justify collateral relief, Etheridge fails on the merits of such a claim. Because Etheridge has not established a miscarriage of justice, his substantive actual innocence claim and his ineffective assistance of counsel claims will be dismissed as procedurally barred.

## VI. *THE CUSTODIAL STATEMENT*

Etheridge claims that admission into evidence of the inculpatory statements that he made to officer Day after his arrest violated the rule of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because Etheridge did not explicitly waive his right to counsel, he claims that the inculpatory statements he made were inadmissible under *Miranda.*

---

94. Statement of Facts 385.

95. Statement of Facts 366, 380, 397, 411.

96. In a separate, exhausted habeas claim Ethcridge challenges the admission of the custodial statement he made in the car to officer Day that he had killed Christie. While the court concludes that a *Miranda* violation occurred, the error was harmless. *See infra* subpart VI.C. Moreover, when reviewing procedural claims of actual innocence, the habeas court must consider evidence improperly admitted, giving due regard to any unreliabili-

ty. *See Schlup,* 115 S.Ct. at 867; *Lucas,* 132 F.3d at 1077. Statement of Facts 636.

97. Etheridge Statement at 1–2, State's Exhibit 125, Statement of Facts 1134–35.

98. Statement of Facts 156, 168.

99. Statement of Facts 579, 586.

100. Statement of Facts 585–86.

101. Etheridge did submit records supporting his allegation that his brother had a history of violent crime and sexual deviancy.

## A. Circumstances Leading to the Statement

Paul Day, a member of the Houston Police Department's SWAT team, met with Brazoria County law enforcement around 6:30 a.m. on February 7, 1990, to assist in the search for Etheridge. The Brazoria County officers gave Day a picture of Etheridge and told him that Etheridge was wanted in connection with the assaults at the Chauviere home.

About an hour later, while driving south on Highway 288, Day saw a man walking along the side of the road who resembled the picture of Etheridge. Officer Day, wearing a black t-shirt with a small police insignia and driving an unmarked police car, pulled to the side of the road. Etheridge, apparently hitchhiking, ran towards the car, opened the door, got in, and thanked Day for the ride. Day told Etheridge to put his hands on the dashboard. After Day identified himself as a police officer, Etheridge complied. Day requested identification, and Etheridge initially gave him a false name. However, when Day showed Etheridge the picture, Etheridge admitted that he was the man in the photograph. Officer Day handcuffed Etheridge in the car and then had him get out of the car.[102] Officer Day arrested Etheridge, searched him, and gave him his *Miranda* warning. Officer Day then put Etheridge back in the car and continued on to Brazoria County.

While driving, officer Day asked Etheridge if he knew why he was under arrest. Etheridge responded, "Yes, I know I'm under arrest for killing that fifteen-year-old girl." He continued, "I'm sorry for what I did, and I was going back to Brazoria County to turn myself in."[103] At an evidentiary hearing on Etheridge's motion to suppress these statements, the trial court found in relevant part that officer Day had given Etheridge the warning required by *Miranda* and that Etheridge had not requested a lawyer.[104]

## B. Application of *Miranda*

In order to protect the Fifth Amendment's privilege against self-incrimination, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 1612, 1630, 16 L.Ed.2d 694 (1966), that state and federal prosecutors cannot use statements made by a defendant during a custodial interrogation unless law enforcement have first informed the defendant of his rights and followed certain procedural safeguards. Relevant to this case, the Court declared that "[A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." *Id.* at 1626. If officers continue an interrogation without the presence of an attorney, the prosecution bears a "heavy" burden "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 1628.

Etheridge argues that the statement he made in the car to officer Day was the result of custodial interrogation and that he had not waived his right to the presence of counsel. Etheridge contends that the trial court should therefore have suppressed his statements that he knew that he was under arrest for killing a fifteen-year-old girl, that he was sorry for what he had done, and that he was heading back to Brazoria County to turn himself in. Johnson argues that the first sentence of Etheridge's response—"Yes, I know I am under arrest for killing that fifteen-year-old girl"—did not inculpate him and that the second statement—"I'm sorry for what I

---

**102.** A second Houston SWAT officer had been driving a second unmarked car on Highway 288 and had also seen Etheridge walking along the road. He pulled over and assisted Day in arresting and searching Etheridge. The officer then got back into his car and drove away separately.

**103.** *Etheridge v. State*, 903 S.W.2d 1, 15 (Tex. Crim.App.1994); III Statement of Facts for Pre–Trial Motions 39–63.

**104.** IV Statement of Facts for Pre–Trial Motions 167–68.

did, and I was going back to Brazoria County to turn myself in"—while inculpatory, was not a response to Day's question but rather a voluntary, unsolicited statement by Etheridge. Johnson argues that Etheridge's statement therefore did not result from custodial interrogation.[105]

■■■■■ *Miranda* applies to all custodial statements, whether inculpatory or exculpatory. *Miranda,* 86 S.Ct. at 1612. Thus, even if the court agreed with Johnson's argument that the sentence "Yes, I know I'm under arrest for killing that fifteen-year-old girl" was not inculpatory, *Miranda* still requires its exclusion at trial absent a waiver by Etheridge. *Miranda* applies "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). A statement is the product of interrogation if the questioning officers should have known that their words or actions were reasonably likely to elicit an incriminating response. *See id.* at 1690, 1691. The focus of the inquiry is on the perceptions of the suspect, not the intent of the officers. Etheridge bears the burden of establishing that his statements were the result of custodial interrogation. *See id.* at 390.

Day asked Etheridge if he understood why he was under arrest. An officer should know that this question might elicit an incriminating response. It is true that

Etheridge could have answered in a noninculpatory manner. For example, he could have said, "Yes, I understand that I've been charged with murder," or "Yes, you think I killed someone." However, Etheridge could also have responded with an inculpatory answer, such as, "because I killed someone," or "you arrested me for that murder I committed a few days ago." He could have described the crime with details only the killer would have known. The response Etheridge actually gave— "Yes, I know I'm under arrest for killing that fifteen-year-old girl"—was a reasonably likely inculpatory response. The Texas Court of Criminal Appeals held that the first sentence of Etheridge's response was in fact the result of custodial interrogation when it reviewed this claim on his direct appeal.[106] Because this court concludes that officer Day should have known that his question was reasonably likely to elicit an incriminating response, officer Day conducted a custodial interrogation.

Johnson argues that the second sentence of Etheridge's response was not a result of that custodial interrogation because it exceeded the scope of Day's question. The Court of Criminal Appeals agreed with this position on direct appeal, holding that the second sentence "was not the result of custodial interrogation, rather it was an admission of guilt beyond the scope of the arresting officer's inquiry."[107] *Id.* Johnson's argument would require this court to

---

105. Johnson's Amended Answer and Motion for Summary Judgment [Docket Entry No. 16] at 41–42.

106. *See Etheridge,* 903 S.W.2d at 15.

107. It is arguable whether under 28 U.S.C. § 2254(d)–(e) the conclusion of the Court of Criminal Appeals should have any effect on this court's analysis of Etheridge's claim. The Court of Criminal Appeals confined its analysis to whether the statement complied with the admissibility requirements outlined in Tex.Code Crim.Proc.Ann. art. 38.22, § 5 (Vernon 1979). The court did not undergo a *Miranda* analysis. *See Etheridge,* 903 S.W.2d at 15–16. This was understandable since Etheridge confined his claim on direct appeal to the admissibility of the statement under arti-

cle 38.22; he did not raise a *Miranda* claim. However, he did ask the trial court to suppress the statement in part pursuant to *Miranda.* In his motion to suppress, he alleged that the court should exclude the statement because "[n]o attorney was present during the discussions" between Etheridge and officer Day. *See* Motion to Suppress Defendant's Statements at 3, Transcript at 219. The trial court examined the admissibility of the statement at a suppression hearing and concluded *inter alia* that Etheridge's statement was not in violation of the Fifth or Fourteenth Amendments. *See* IV Statement of Facts for Pre-Trial Motions 167–68. Etheridge therefore fairly presented his *Miranda* claim to the trial court and has exhausted the claim. *See also* First Amended Application, *Ex Parte Etheridge,* No. 36, 443–01 at 34–35, 45–47.

recognize a causative link between the question asked by the interrogator and the incriminating response by the petitioner. Under this reasoning only certain inculpatory statements—those that directly answer the question asked during custodial interrogation—would be excludable under *Miranda.* The *Innis* definition of custodial interrogation, however, does not cut so finely. It focuses on the nature of the questioning officer's conduct by asking whether the conduct was reasonably likely to elicit an incriminating response. *See Innis,* 100 S.Ct. at 1688–90.

] Officer Day should have known that asking whether Etheridge knew why he was under arrest would likely elicit an incriminating response. In fact, the question did elicit an incriminating response, and the Court of Criminal Appeals so held. Etheridge was thus exposed to interrogation while in custody. Both sentences of Etheridge's answer were incriminatory statements in response to Day's question. While voluntary statements are admissible under *Miranda,* 86 S.Ct. at 1630, the crucial issue here is whether Etheridge had waived his right to the presence of counsel when he made the statement.

] Under *Miranda,* Etheridge had a right to have counsel present during any custodial interrogation. *See Miranda,* 86 S.Ct. at 1626. Any statements that he made pursuant to interrogation without counsel present were inadmissible unless Etheridge waived his right to the presence of counsel. *See id.* at 1628. The court cannot presume waiver; Johnson has the "heavy" burden to show that Etheridge knowingly and intelligently waived his right to have counsel present. *See id.; North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). Waiver of counsel is examined case-by-case based upon the facts and circumstances at hand, "including the background, experience, and conduct of the

accused." *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). When it denied Etheridge's motion to suppress the statement to officer Day, the trial court found that Etheridge's statements were freely and voluntarily made. The proper standard under *Miranda,* however, is not voluntariness; it is whether the petitioner knowingly and intelligently waived his right to the presence of counsel. Johnson confines his argument to the voluntariness of Etheridge's statement and offers no evidence to support his heavy burden of showing that Etheridge knowingly and intelligently waived his right to counsel when he answered Day's question. The court concludes that Johnson has failed to show waiver.

] Officer Day interrogated Etheridge without the presence of counsel after warning him of his rights while Etheridge was in custody. Day asked Etheridge a question that was reasonably likely to elicit an incriminating response. Etheridge responded with two incriminatory sentences. The second sentence was part of the same statement Etheridge made in response to Day's question and was inculpatory in nature. Johnson has not met his heavy burden of establishing that Etheridge knowingly and intelligently waived the right to counsel. The court therefore concludes that the trial court violated *Miranda* when it denied Etheridge's motion to suppress the custodial statement made to officer Day.[108]

## C. Effect of Violation

Having concluded that a *Miranda* violation occurred at Etheridge's trial, the court must determine what effect that error has on collateral review. Habeas errors fall into two categories:

 (1) trial errors and

**108.** Johnson's waiver argument only extends to the second sentence of Etheridge's statement; he does not argue that Etheridge waived his right to counsel with respect to the

first sentence. Assuming *arguendo* that the second sentence was admissible, a *Miranda* violation nevertheless occurred with respect to the first sentence.

(2) structural errors.

See *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993). " 'Structural error' is error 'affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " *White v. Johnson,* 153 F.3d 197, 201–02 (5th Cir.1998) (quoting *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991)), *cert. denied,* —— U.S. ——, 119 S.Ct. 1048, 143 L.Ed.2d 54 (1999). Examples of structural error include:

(1) deprivation of the right to counsel at trial,

(2) trial by a biased judge,

(3) "unlawful exclusion of members of the defendant's race from a grand jury,"

(4) deprivation of the right to represent oneself at trial, and

(5) deprivation of the right to a public trial.

See *Fulminante,* 111 S.Ct. at 1265. Conversely, violations of prophylactic rules such as those announced in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), constitute trial errors and are subject to a harmless-error analysis. *See Brecht,* 113 S.Ct. at 1717; *Goodwin v. Johnson,* 132 F.3d 162, 181 (5th Cir.1997). Indeed, the *Edwards* rule is simply an extension of the prophylactic rule announced by *Miranda.* *See United States v. Webb,* 755 F.2d 382, 388 (5th Cir.1985). Unlawful admission of evidence generally constitutes trial error. *See Fulminante,* 111 S.Ct. at 1265. The court therefore concludes that the Miranda violation in this case was a trial error and not a structural one.

] In *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Court held that federal courts may grant a writ of habeas corpus based on trial errors only when the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 1722 (quoting *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *accord Calderon v. Coleman,* 525 U.S. 141, 119 S.Ct. 500, 502, —— L.Ed.2d —— (1998). Recognizing that some trial errors that might require reversal on direct appeal do not support relief on collateral review, the *Brecht* Court concluded that harmless-error review should govern trial errors. *See id.* at 1720, 1722. "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *White,* 153 F.3d at 202 (quoting *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986)).

 Other than the custodial statement at issue, there was ample evidence establishing Etheridge's guilt. Physical evidence at the Chauviere home, including Etheridge's car and blood that matched his DNA and blood-type, placed Etheridge at the scene of the crime. Etheridge told several people on the evening of February 2, 1990, that he had just killed someone with a knife. Etheridge made inculpatory statements in his other two statements to police, as well as in his phone call to his father. Gail Chauviere testified that Etheridge attacked her with a knife and threatened to cut Christie's throat. The court concludes that Etheridge's two-sentence response to officer Day's custodial question did not have a substantial and injurious effect in determining the jury's guilty verdict. Because the admission of Etheridge's inculpatory statements to officer Day was harmless, the court will grant Johnson summary judgment on Etheridge's *Miranda* claim.

## VII. *CLAIMS PREMISED ON PENRY V. LYNAUGH*

Etheridge's remaining exhausted claim challenges the adequacy of the trial court's instructions to the jury under *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Etheridge argues that the instructions to the jury did not allow the jury to give effect to any mitigat-

ing evidence that he could have offered, that the instructions would have effectively required a nullification verdict, and that he was denied equal protection under the Fourteenth Amendment.

## A. Etheridge's Sentencing Hearing

Twelve witnesses testified for the prosecution at Etheridge's sentencing hearing; Etheridge rested without calling any witnesses.[109] Pursuant to the Texas capital punishment scheme, the trial court submitted two special issues to the jury:

(1) Was the conduct of the Defendant, GARY WAYNE ETHERIDGE, that caused the death of the deceased, Christie Chauviere, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

(2) Is there a probability that the Defendant, GARY WAYNE ETHERIDGE, would commit criminal acts of violence that would constitute a continuing threat to society? [110]

The court instructed the jury:

You are instructed that if you return an affirmative finding on each of the Issues submitted to you, the court shall sentence the defendant to death. You are further instructed that if you return a negative finding on any Issue submitted to you, the court shall sentence the defendant to the penitentiary for life. You are therefore instructed that your answers to the Issues, which determine the punishment to be assessed the defendant by the court, should be reflective of your finding as to the personal

culpability of the defendant, GARY WAYNE ETHERIDGE, in this case.[111]

The court then explained how the jury should consider mitigating evidence:

You are instructed that when you deliberate on the questions posed in the Issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the Issues. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one or more of the Issues under consideration.[112]

Etheridge did not object to the court's charge on punishment.[113] The jury answered "yes" to both special issues, and the trial court sentenced Etheridge to death.[114]

## B. *Penry* Mitigation Claim

Etheridge claims that the court's instructions did not provide any realistic,

---

**109.** Statement of Facts 952.

**110.** Charge of the Court on Punishment at 6–7, Transcript at 271–72. At the time of Etheridge's trial and punishment hearing, Tex.Code Crim.Proc.Ann. art. 37.071(b) required the submission of these two issues, as well as a third issue if the evidence raised the issue of provocation. *See* Act effective June 14, 1973, 63rd Leg., R.S., ch. 426, art. 3, § 1, *amended by* Act of May 17, 1991, 72nd Leg., R.S., ch. 838, § 1, 1991 Tex.Sess.Law Serv. 2898.

Provocation was not an issue at Etheridge's trial.

**111.** Charge of the Court on Punishment at 3, Transcript at 268.

**112.** *Id.*

**113.** Statement of Facts 964.

**114.** *See* Judgment, *State v. Etheridge*, No. 20,-837 (23rd Dist.Ct., Brazoria County, Nov. 8, 1990); Transcript at 275.

lawful means for the jury to give effect to mitigating evidence. The jury was instructed to examine the two special issues to decide whether Etheridge acted deliberately and whether he constituted a continuing violent threat to society. According to Etheridge the jury was then instructed to change a "yes" answer to "no" if the mitigating evidence called for life sentence rather than execution. Etheridge argues that the instruction was therefore confusing. He also argues that the instruction was illegal because, by instructing the jury to change a "yes" answer to a "no," it called for the jury "to disregard the law, the evidence, their own instincts, and their oaths as jurors" and nullify their answers.[115]

■■■■ The Eighth Amendment requires that a sentencing court provide an individualized sentencing determination before the court can impose a capital sentence. *See Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929 (1976) (plurality opinion). A capital punishment scheme not only must allow a defendant to present mitigating evidence to the jury, the scheme must also allow the jury to consider the evidence and give it effect when imposing sentence. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 2947, 2951–52, 106 L.Ed.2d 256 (1989). In reviewing sentences under the Texas death penalty regime, the constitutional validity "turns on whether the enumerated questions allow consideration of particularized factors." *Madden v. Collins*, 18 F.3d 304, 306 (5th Cir.1994) (quoting *Jurek*, 96 S.Ct. at 2956 (plurality opinion)).

■■■■ When reviewing a *Penry* claim the test is whether "there is a 'reasonable likelihood that the jury applied the challenged instruction in a way that prevent

[ed] the consideration of constitutionally relevant evidence.'" *Lackey v. Scott*, 28 F.3d 486, 488 (5th Cir.1994) (quoting *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993) (quoting *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990))). The court must examine two issues:

(1) the constitutional relevance of the mitigating evidence offered at trial, and

(2) whether the relevant mitigating evidence was beyond the effective reach of the jury.

*See Davis v. Scott*, 51 F.3d 457, 460 (5th Cir.1995); *Madden*, 18 F.3d at 308. Before the court may determine whether the instructions adequately allowed for mitigation, the court must first determine whether the mitigating evidence was constitutionally relevant.

■■■■ To be constitutionally relevant under *Penry*, Etheridge's mitigating evidence must show that:

(1) he suffers from a uniquely severe and permanent handicap that burdens him through no fault of his own, and

(2) the murder was attributable to this permanent, severe condition.

*See Davis v. Scott*, 51 F.3d at 460–61. More fundamentally, however, courts may only review mitigating evidence actually offered at trial; "a petitioner cannot base a *Penry* claim on evidence that could have been, but was not, proffered at trial." *Anderson v. Collins*, 18 F.3d 1208, 1214–15 (5th Cir.1994); *see Woods v. Johnson*, 75 F.3d 1017, 1033 (5th Cir.1996); *Lackey*, 28 F.3d at 489 n. 3.

---

115. *See* Petition for Writ of Habeas Corpus [Docket Entry No. 7] at 26, 24–27; Petitioner's Response to Respondent's Motion for Summary Judgment [Docket Entry No. 17] at 8–9. Etheridge, however, took the opposite position at the sentencing hearing. During closing arguments in this phase, his counsel told the jury that the mitigating evidence instruction did not ask them to change a "yes" to a "no": "That's not what the judge tells you. He says you consider everything and then vote 'yes,' or 'no.'" *See* Statement of Facts 980. Because, as explained below, Etheridge has failed to offer constitutionally relevant mitigating evidence, the court need not examine this issue. Without constitutionally relevant evidence, petitioner has no *Penry* claim.

█] While Etheridge argues that the instructions prevented the jury from giving effect to evidence of childhood physical and sexual abuse, a childhood head injury, and drug dependency, he offered no evidence of these background circumstances at trial. He rested without offering evidence at the sentencing hearing. Etheridge points to no evidence offered during the liability phase of the trial or during the state's direct case at the sentencing hearing that constituted mitigating evidence. Etheridge admits as much in his petition:

> The jury did not hear that the Petitioner had been anally raped at an early age over a period of years by an older brother, that he had been physically abused by a drunken father, that he had observed his mother attempt suicide several times, that he had suffered a head injury as a child, that he had endured a drug dependency since adolescence, or that the conviction for aggravated assault in prison was for resisting an attempted rape by another prisoner. There was no testimony from an expert, such as a psychiatrist or psychologist, as to the effect all these factors had on the Petitioner. In addition, the jury did not hear that all five Etheridge sons—the Petitioner and his four brothers—were affected by their upbringing resulting in

incarceration as convicts in the county jail or Texas Department of Criminal Justice Institutional Division. *All of this evidence could have been presented at trial.*[116]

Without any evidence to consider, the court cannot conclude that Etheridge's mitigating evidence was constitutionally relevant. Thus, "there is no basis for a *Penry* claim." *Briddle v. Scott*, 63 F.3d 364, 377 (5th Cir.1995).[117] Having concluded that Etheridge has failed to satisfy the constitutional relevance inquiry, the court need not examine whether the mitigating evidence was beyond the effective reach of the jury. *See Madden v. Collins*, 18 F.3d 304, 308 (5th Cir.1994). Etheridge cannot prevail on his *Penry* mitigation claim.

## C. *Penry* Equal Protection Claim

Etheridge also contends that, given legislation subsequently enacted by the Texas Legislature to implement the requirements of *Penry*, the alleged inadequacy of his jury instructions violated the Equal Protection Clause of the Fourteenth Amendment.[118] Etheridge alleges that he was unconstitutionally treated differently than others who, like him, committed capital murder before September 1, 1991, but who were sentenced after August 30, 1993. He

**116.** Petition for Writ of Habeas Corpus [Docket Entry No. 7] at 6–7 (emphasis added).

**117.** Etheridge explains that his attorneys did not offer mitigating evidence because they feared that without a specific special issue on mitigation alone, the evidence of Etheridge's abusive life would leave a "chilling effect" because it would result in affirmative answers to the two special issues the court submitted. (Petition for Writ of Habeas Corpus [Docket Entry No. 7] at 7) Etheridge made no objections to the punishment charge; nor did he request an additional special issue.

Etheridge raises ineffective assistance of counsel claims on both his counsels' failure to request an adequate jury instruction and on his counsels' failure to make a bill of exceptions containing mitigating evidence. The court has already concluded that these claims are procedurally barred. *See supra* Part IV. Etheridge also alleges "involuntary" ineffec-

tive assistance of counsel for his counsels' inability to offer a mitigation defense. The court has also concluded this claim is procedurally barred. *See id.* To the extent that Etheridge relies on the "chilling effect" theory as a basis for his *Penry* claim and for his separate, involuntary ineffective assistance of counsel claim, Fifth Circuit precedent forecloses relief. *See Briddle*, 63 F.3d at 378 ("We have ... consistently rejected the ... argument that the Texas statutory sentencing scheme is invalid as preventing or chilling defense counsel's development of mitigating evidence."); *see also Woods v. Johnson*, 75 F.3d 1017, 1033 (5th Cir.1996). Moreover, the Supreme Court has rejected the notion that the Constitution requires a separate mitigation special issue. *See Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 2671, 125 L.Ed.2d 290 (1993).

**118.** "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

also contends that he was unconstitutionally treated differently than capital murderers who killed after September 1, 1991.

### 1. The Statutory Evolution of the Special Issues Scheme for Capital Punishment in Texas

In 1973 the Texas Legislature enacted the special-issues procedure for capital punishment hearings under which Etheridge was sentenced.[119] The statute was amended slightly in 1985.[120] Article 37.071 of the Texas Code of Criminal Procedure required a separate sentencing hearing before the same jury that determined a defendant's guilt. At this hearing both the prosecution and defense could present evidence and arguments focused on three special issues the jury was asked to decide. Under the 1973 statute the court was required to ask the jury:

(1) whether the defendant deliberately killed the victim;

(2) whether there is a probability that the defendant will continue to threaten society with violent conduct; and

(3) when the evidence raises the question of provocation, whether the defendant's conduct was an unreasonable response to the provocation.[121]

A unanimous vote was required to return a "yes" on any question; the jury could not answer "no" unless at least ten jurors agreed. If the jury answered "no" to any of the questions, the court was required to impose a life sentence. If the jury answered "yes" to all of the special issues, the Act required the court to impose the death sentence.[122]

This was the statute examined by the Supreme Court in *Penry*. *See Penry*, 109 S.Ct. at 2942. The Court in *Penry* concluded that the statute did not allow the jury in that case to give effect to mitigating evidence of the defendant's mental retardation and abusive childhood. *See id.* at 2947. The Court did not hold that the statute was facially invalid; the statute simply failed to accommodate the evidence offered in that case.

The Court issued its decision in *Penry* on June 26, 1989. Etheridge's sentencing hearing occurred on November 7, 1990. Although the trial court gave a mitigating evidence instruction to the jury, it did not submit a separate special issue asking whether mitigating evidence justified a life sentence in spite of Etheridge's deliberateness and future dangerousness.

In 1991 the Texas Legislature amended art. 37.071 to allow explicitly consideration of mitigating evidence.[123] The Legislature repealed the deliberateness and provocation special issues and added a new special issue for cases involving the law-of-the-parties doctrine.[124] The Legislature also amended the statute to expressly allow the jury to consider mitigating evidence in considering the special issues. *See* Tex. Code Crim.Proc.Ann. art. 37.071, § 2(d)(1) (Vernon Supp.1999). The statute requires the jury to consider a third special issue if it answers "yes" to the future dangerousness and law-of-the-parties special issues:

---

**119.** *See* Act effective June 14, 1973, 63rd Leg., R.S., ch. 426, art. 3, § 1 (codified as amended at Tex.Code Crim.Proc.Ann. art. 37.071).

**120.** *See* Act of April 15, 1985, 69th Leg., R.S., ch. 44, § 2, 1985 Tex.Sess.Law Serv. 169.

**121.** *See id.* sec. (b) (formerly Tex.Code Crim. Proc.Ann. art. 37.071(b) (Vernon 1979)).

**122.** *See id.* secs. (d)–(e) (formerly Tex.Code Crim.Proc.Ann. art. 37.071(d)–(e) (Vernon 1979)).

**123.** *See* Act of May 17, 1991, 72nd Leg., R.S., ch. 838, § 1, 1991 Tex.Sess.Law Serv. 2898 (amending Tex.Crim.Proc.Ann. art. 37.071).

**124.** Under the new statute the jury must still consider the defendant's future dangerousness, but deliberateness and provocation are no longer issues. In cases where the court allowed the jury to find the defendant guilty based upon the law of the parties, the jury must answer whether the defendant killed the victim or intended to kill the victim. *See* Tex.Code Crim.Proc.Ann. art. 37.071, § 2(b) (Vernon Supp.1999).

The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[125]

A "no" answer requires the unanimous agreement of the jury; a "yes" answer requires a vote of at least ten jurors. *See id.* § 2(f)(2) (Vernon Supp.1999). If the jury answers "no" to the mitigation special issue, the court must impose the death sentence; if the jury answers "yes," the sentence is life imprisonment. *See id.* § 2(g) (Vernon Supp.1999).

At the time of enactment the Legislature expressly provided that the amendments only applied to offenses occurring on or after September 1, 1991.[126] The former procedures applied to offenses that occurred before that date.[127]

In 1993 the Legislature added article 37.0711 to the Code of Criminal Procedure.[128] This statute, which became effective on September 1, 1993, is a hybrid of the pre– and post–1991 sentencing procedures for offenses that occurred before September 1, 1991.[129] Under this statute the prosecution and defense may offer any evidence relevant to the sentence.[130] Like the pre–1991 system, the court then must submit the three traditional special issues—deliberateness, future dangerous-ness, and provocation—to the jury.[131] However, article 37.0711 also required the court to submit to the jury the same special issue on mitigation that is required under the amended article 37.071.[132] Article 37.0711 governs sentencing hearings that occur after August 30, 1993, for offenses committed before September 1, 1991, "whether the sentencing procedure is part of the original trial of the offense, an award of a new trial for both the guilt or innocence stage and the punishment stage of the trial, or an award of a new trial only for the punishment stage of the trial."[133]

The net effect of these enactments is that defendants who allegedly committed capital offenses occurring after September 1, 1991, or whose sentencing hearing occurred after August 30, 1993, were entitled to a mitigation special issue and a statutorily required jury instruction on mitigating evidence under article 37.0711 or amended article 37.071. However, defendants like Etheridge, who committed their offenses before September 1, 1991, and whose sentencing hearing occurred before August 30, 1993, did not receive the benefit of these new procedures. Etheridge argues that this circumstance violates the Equal Protection Clause and that he is therefore entitled to a new sentencing hearing under article 37.0711.

### 2. *Application of the Equal Protection Clause*

▆▆▆ The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Rolf v. City of San Antonio,* 77 F.3d 823, 828 (5th Cir.1996) (quoting *City of Cle-*

---

**125.** *Id.* § 2(e) (Vernon Supp.1999).

**126.** *See* Act of May 17, 1991, § 5(a) (codified at Tex.Code Crim.Proc.Ann. art. 37.071, § 2(I) (Vernon Supp.1999)).

**127.** *See id.* § 5(b).

**128.** *See* Act of May 30, 1993, 73rd Leg., R.S., ch. 781, § 2, 1993 Tex.Sess.Law Serv. 3060 (codified as amended at Tex.Code Crim.Proc. Ann. art. 37.0711).

**129.** *See* Tex.Code Crim.Proc.Ann. art. 37.0711, § 1 (Vernon Supp.1999).

**130.** *See id.* § 3(a) (Vernon Supp.1999).

**131.** *See id.* § 3(b) (Vernon Supp.1999).

**132.** *See id.* § 3(e)–(f) (Vernon Supp.1999).

**133.** *Id.* § 1 (Vernon Supp.1999).

burne v. Cleburne Living Ctr., 473 U.S. 432, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)). Courts may conduct an equal protection inquiry only "if the challenged government action classifies or distinguishes between two or more relevant groups." Rolf, 77 F.3d at 828. Courts apply different standards of review depending upon the right or classification implicated. If a classification disadvantages a "suspect class" or infringes upon a "fundamental right," the classification is subject to strict scrutiny. Otherwise, courts apply the less stringent "rational basis" review. See id.

Etheridge argues that strict scrutiny should apply because "[t]here is no personal right so fundamental as the right to life."[134] Yet with one exception,[135] the Supreme Court has consistently held that the special-issues procedure adopted in 1973 adequately guards a capital defendant's Eighth Amendment protection against cruel and unusual punishment. See Johnson v. Texas, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); Graham v. Collins, 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993); Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (plurality opinion). In fact, in Johnson the Court upheld the sentence of a defendant in the same historical circumstance as Etheridge.

The defendant in Johnson had murdered a store clerk while committing a robbery on March 23, 1986, five years before the 1991 amendments to article 37.071. See Johnson, 113 S.Ct. at 2661. At his sentencing hearing the trial court gave the deliberateness and future dangerousness special issues to the jury. See id. at 2662. Even though the Supreme Court had not yet decided Penry, the trial court

gave a mitigation instruction similar to the instruction given in Etheridge's case:

> In determining each of these Issues, you may take into consideration all the evidence submitted to you in the trial of this case, whether aggravating or mitigating in nature, that is, all the evidence in the first part of the trial when you were called upon to determine the guilt or innocence of the Defendant and all the evidence, if any, in the second part of the trial wherein you are called upon to determine the answers to the Special Issues.[136]

The Court examined the jury instructions along with the constitutionally relevant mitigating evidence and concluded that the sentencing scheme adequately met Eighth Amendment safeguards. See id. at 2669–70. The Court held that the Constitution did not require that the jury receive a separate special issue on mitigation. See id. at 2671.

To the extent that Etheridge's fundamental right to life is at stake, article 37.071 adequately protected that right. Etheridge's real contention is that some capital defendants received more protection under the 1991 and 1993 amendments. This additional statutory protection does not implicate a fundamental right, however, because there is nothing in the Constitution that required the Legislature to grant it. Etheridge does not have a fundamental right to statutory protection over and above that required by the Constitution. Because a fundamental right is not at stake and because Etheridge does not allege that he is a member of a suspect class, the appropriate standard of review is rationality: "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally

---

**134.** Petition for Writ of Habeas Corpus [Docket Entry No. 7] at 30. Etheridge offers no explanation as to what provision in the Constitution explicitly governs the right to life. Given the criminal context of this case as well of the context of Etheridge's claim, the court will proceed under the assumption that the Cruel and Unusual Punishment Clause of

the Eighth Amendment contains the fundamental right to life relied upon by Etheridge.

**135.** See Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**136.** Id. (emphasis added).

related to a legitimate state interest." *City of Cleburne*, 105 S.Ct. at 3254.

The new mitigation procedures enacted by the Legislature in article 37.0711 only apply when a defendant who killed before September 1, 1991, is resentenced after August 30, 1993. In other words, it does not apply at all unless a court awards a new trial or orders a new sentencing hearing after August 30, 1993. The Legislature chose this date because it was ninety days after the date of adjournment.[137] This ninety-day period is a typical, rational legislative decision related to the need for the orderly enactment, publication, codification, and enforcement of the laws.

 It was rational for the Texas Legislature to have confined article 37.0711 to new trials or new sentencing hearings—circumstances in which a court has reopened a judgment—and to have confined the amendments to article 37.071 to new offenses. The State of Texas has a legitimate interest "in the finality of convictions that have survived direct review within the state court system." *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993).

Moreover, even if the court were to agree with Etheridge's arguments, the court could not grant him relief without applying a new constitutional rule in violation of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). In addition, since Etheridge failed to offer constitutionally relevant mitigation evidence at trial, he cannot prevail on his *Penry* claim in this federal habeas case. To the extent that Etheridge's equal protection argument relies on an application of *Penry*, his claim thus fails. For all of these reasons, Etheridge's equal protection claim fails.

Because none of Etheridge's mitigation and equal protection arguments are meritorious, the court will grant Johnson summary judgment on Etheridge's claim that

the jury instructions at sentencing violated the Constitution.

## VIII. *INEFFECTIVE ASSISTANCE OF COUNSEL*

 Etheridge raises four claims of ineffective assistance of counsel, all of which challenge the effectiveness of his attorneys at the sentencing hearing. The court has already concluded that these claims are procedurally barred.[138] Moreover, the Fifth Circuit has held that the premise of Etheridge's "involuntary" ineffective assistance claim—that the sentencing scheme prevented counsel from developing mitigating evidence at the sentencing hearing—does not justify habeas relief. *See Woods v. Johnson*, 75 F.3d 1017, 1033 (5th Cir.1996); *Briddle v. Scott*, 63 F.3d 364, 378 (5th Cir.1995). Most relevant is Etheridge's own evaluation, made on the record during the sentencing hearing in a colloquy with the court regarding his right to testify, about his attorneys: "They done a good job." [139]

## IX. *ETHERIDGE'S REQUEST FOR AN EVIDENTIARY HEARING*

Etheridge asks the court to hold an evidentiary hearing on his claims. Most of Etheridge's claims are procedurally barred. His *Penry* claims are limited to the evidence offered at trial. Because the court concludes that an evidentiary hearing would not develop facts relevant to the constitutionality of Etheridge's conviction and sentence, the court will deny the request. *See McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir.1998).

## X. *CONCLUSION AND ORDER*

Etheridge's ineffective assistance of counsel claims are procedurally barred. To the extent that Etheridge raises a substantive actual innocence claim, he does not state a claim upon which habeas relief

---

137. *See* Act of May 30, 1993, 1993 Tex.Sess. Law Serv. at 3062.

138. *See supra* Parts IV–V.

139. Statement of Facts 960.

may be granted, and such a claim is procedurally barred. Ineffective assistance of habeas counsel in failing to raise these claims does not constitute cause for default. Because Etheridge has failed to establish his actual innocence, the miscarriage of justice exception does not apply.

While the admission into evidence of Etheridge's custodial statement to officer Day violated *Miranda v. Arizona*, the violation did not have a substantial and injurious effect on the jury's verdict and was therefore harmless. Because Etheridge did not offer mitigating evidence or demonstrate to this court how the evidence at trial was constitutionally relevant mitigating evidence, his *Penry* mitigation claim fails. The Texas capital sentencing regime is rationally related to the State's interest in the finality of judgments and has not denied Etheridge the equal protection of the laws. For all of these reasons, as well as the reasons explained elsewhere in this opinion, Respondent Johnson's Amended Answer and Motion for Summary Judgment (Docket Entry No. 16) is **GRANTED**. Etheridge's Request for Evidentiary Hearing (Docket Entry No. 7) is **DENIED**. The Petition for Writ of Habeas Corpus (Docket Entry No. 7) will be dismissed with prejudice.

**SIGNED** at Houston, Texas, on this 19th day of May, 1999.