IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-20602
_____

GARY WAYNE ETHERIDGE,

Petitioner-Appellant,

versus

GARY L. JOHNSON, Director,
Texas Department of Criminal
Justice, Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
(4:98-CV-3910)
_____

February 2, 2000

Before JOLLY, SMITH, and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

In this death penalty case, the petitioner, Gary Wayne
Etheridge, seeks a certificate of appealability ("COA"). Etheridge
seeks certification of two issues relating to his state trial and
death sentence for the murder of fifteen-year-old Christie
Chauviere while in the course of robbing her and sexually
assaulting her. Etheridge argues that his state habeas counsel
rendered ineffective assistance for failure to raise the
ineffectiveness of his state trial counsel, who had failed to
introduce mitigating evidence during the sentencing phase of his

_____

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

trial.  We are presented this rather convoluted ineffective assistance claim because Etheridge is now procedurally barred from exhausting in state courts the ineffectiveness of his state trial counsel--an issue he hopes to reach by using habeas counsel's failures as a basis for cause and prejudice, which in turn would avoid the procedural bar.  Further, Etheridge argues that his equal protection rights were violated as a result of the trial court's failure to give the jury a mitigating instruction during the sentencing phase of his trial.  We conclude that Etheridge has failed to make a substantial showing of the denial of a constitutional right.  Thus, we deny his application for a COA.

I

A

On February 2, 1990, Gail Chauviere arrived home from work at approximately 5:40 p.m.  She was employed as the project manager of a townhouse-condominium complex in San Luis Pass, Texas.  Because of the nature of her job, Gail usually brought a bag of cash home with her from the workplace.

Upon arriving home, Gail noticed a dark car parked in her driveway.  As she got out of her car, a dog came from behind the parked car and ran towards her.  Gail immediately recognized the dog, because only a few days earlier she had given the dog to one of her co-workers at the apartment complex, Gary Wayne Etheridge.  Gail thus assumed that the dark car in her driveway belonged to Etheridge.  As Gail approached her house, she was met by Etheridge,

2

who was walking from the direction of the garage. The two entered the house, and Gail placed her purse and the bag containing the money on a chair. Gail's fifteen-year-old daughter, Christie, was the only member of the family at home when Gail and Etheridge entered the house.

Although the exact details of what happened next are not absolutely clear, Gail testified that Etheridge inquired if she was expecting any visitors. Gail responded by saying that she was expecting her father to come over at any minute. Etheridge then inquired as to the location of the money he knew she brought home every day from the office. Gail responded by stating that the money was in the bag she had just placed on the chair. At this point, Gail began pleading with Etheridge that he just take the money and go and that he not harm her daughter Christie. As she spoke these words, she reached for her daughter, who was moving off the sofa where she had been seated since they entered the house. Etheridge reacted to this sudden movement by grabbing Christie by the hair and pulling her towards him. Christie then began to scream, and Etheridge told her to shut up. Realizing that his verbal threats were being ignored, Etheridge then drew a knife from behind his back and threatened to cut Christie's throat if she did not shut up.

After holding the knife to Christie's throat for a few moments, Etheridge released Christie and began to stab Gail. Medical reports indicate that Gail was stabbed two or three times

3

on her left side, and that she suffered a single blow to her head. The blow to Gail's head was so severe that she testified that she thought she heard an explosion in her head. Immediately following the blow to her head, she lost consciousness.

When Gail regained consciousness she began to scream for help. At approximately 5:50 p.m., Gail's neighbor, Lorene McCreight, who had only just seconds earlier knocked on the door to see if Christie was at home to ask her if she could babysit for her the next evening, heard Gail's pleas for help. Mrs. McCreight immediately ran home to get her husband. After returning with her husband, Stan, they tried to enter Gail's house through a back door. When this attempt proved unsuccessful, Stan instructed Lorene to go back to their house and get his gun. Stan then noticed the garage door was open, and he entered the house though it. Inside, he discovered Gail's bloody body lying in the entrance hall. He then noticed Christie's body lying on the other side of the hall. Christie's hands were bound together and she had been stabbed several times on her left side. Stan immediately called the police.

Officer John Rhyne, a Richwood police officer, was the first to respond to the call. Upon arriving, he discovered Christie's body. After a brief examination of her body, Officer Rhyne determined that she had died as a result of a number of stab wounds. Additionally, Office Rhyne noted that Christie's clothes from the waste down had been stripped off, her hands were bound

4

with a telephone cord, and she had been gagged with a towel.

Officer Rhyne then heard someone moaning for help. After a brief search, he discovered Gail lying in an adjacent room. At this point the paramedics had arrived, and Gail was transported to Brazosport Memorial Hospital. After being transferred to Hermann Hospital in Houston, Gail was examined by Dr. James H. Duke. Dr. Duke testified that Gail was admitted to the hospital with multiple penetrating wounds to the neck, face, chest, upper abdomen, and arms. She had a severe wound to her right eye, and a gaping slash wound to her neck. The neck wound was deep enough to have severed the jugular vein, but tests indicated that the vein had not been cut. Although the stab wounds she suffered were severe and life threatening, Gail survived the attack.

B

After fleeing the Chauvieres' home in Gail's car, Etheridge picked up his wife Theresa and their baby daughter Brittany.[1] Etheridge then drove to Theresa's cousins Charles and Glenda Roenker's house. Etheridge told the Roenkers that he had just stabbed a man and that he thought the man was dead. Etheridge cleaned himself up in the Roenker's bathroom and dressed a cut he had suffered to a finger. Etheridge, along with his wife and

---

[1]When Etheridge arrived home to pick up his wife and daughter, he discovered that she was babysitting her friend's, Tanya Ray, two children. Etheridge took the children to a bar in town where Tanya worked, and during a brief conversation with Tanya he told her that he had killed a man in a knife fight.

daughter, then intended to flee the state of Texas. However, after about a half-hour on the road, Etheridge returned to the Roenkers' home and asked them to take care of Brittany.

Somewhere near Mobile, Alabama, Etheridge abandoned his wife. Shortly thereafter, Etheridge wrecked Gail's car.[2] At this point, Etheridge decided that he would hitchhike back to Texas. On February 7, 1990, Paul Day, an off-duty Houston police officer, spotted Etheridge walking along Highway 288 in Texas. Day arrested Etheridge and Mirandized him. Officer Day then asked Etheridge if he knew why he was under arrest. Etheridge responded by saying, "Yes, I know I'm under arrest for killing that fifteen-year-old girl. I'm sorry for what I did, and I was going back to Brazoria County to turn myself in."

After being returned to Brazoria County, Etheridge was again Mirandized, and he signed a document confirming that he had received the warnings. Etheridge then spent four hours answering questions and drafting a written confession. The confession, which Etheridge had an opportunity to view and change, was signed by Etheridge on each page and stated in pertinent part:

> On February 2, 1990, . . . I left my work location and drove to Freeport, Texas and went to a dope house on East Sixth Street where I bought 50 bucks of powder cocaine and Al gave me a needle and I done a shot of dope there at his house. . . . I was driving and I stopped on Gulf

---

[2]While driving Gail's car in Mobile, Alabama, Etheridge swerved off of the road and struck the median. As a result of this collision with the median, two of the car's tires were punctured and deflated.

Boulevard and got the same needle that I had used earlier and done another shot of dope. . . . [After arriving at my house] I went inside the house and locked myself in the bathroom and was doing dope in there for about one and a half hours and my wife, Theresa, kept coming to the door and saying, what are you doing in there. . . . I came out of the bathroom after awhile and I had drank all my beer, so I got in my car and drove to a liquor store on Gulf Boulevard, bought some more beer, and then I called this queer named Ed and he told me come on over to his house in Surfside about 6:00 p.m. and I told him I would have a look at it. . . . [After attempting to buy some more drugs] I headed for Gail's house. . . . I knew where she lives as I had followed her home a few days earlier because she had given me a dog and went over and picked up the dog. When I arrived at Gail's house, her car was not at home and I went up to the house and knocked on the door and Gail's daughter reached up and opened the door and about this time Gail drove up in the driveway and I was still on the porch. . . . Gail walked on in the house and I walked in behind her and I closed the door behind us. Gail's daughter had been on the phone but she hung up when we came in. Gail asked something about the tax paper but I don't remember what it was and I told Gail that I needed some money and she looked sort of worried and she was holding her purse, a money bag and bunch of file papers in her arms and I grabbed the money bag and she freaked out and so did her daughter so I told them, 'sit down on the couch and shut up, bitch,' and I pulled out my knife. Gail and her daughter then sit down on the couch and they were all hysterical. I told them to shut up. All I want is the money. I said, Gail I like you, but I have a drug problem and I have got to have the money and I showed them my arm where I had been shooting up. Gail said all I had to do was tell us and we would have given you some money. . . . At this time they are still sitting on the couch and I tried to gag them with something but I don't remember if I gagged them or not. They were still real hysterical and I told Gail's daughter to sit right there, bitch, and I said I am going to put you, Gail, in the closet and lock it and I told the daughter I am going to put your mother in the closet and I am out of here. I took Gail by the arm and we were heading through the kitchen to a closet and Gail was in front of me and as we entered the kitchen she reached for the counter and swung around and cut me with something on my left index finger and this set me off. I never saw what she cut me with, but I grabbed her by the hair of her head and pushed her

7

down and she fell into the hallway.  I was scared and I kicked her and I was cutting Gail and her daughter was screaming and I went where Gail's daughter was and I was cutting her and Gail and I was Fighting in a little garden room and Gail's daughter came over to where we were and we were all fighting in this little room.  The next thing I remember is I was running outside and I had my pocket knife in my hand and it was all bloody and I got in my car but it would not start and I went into their garage to look for some battery cables but there wasn't none.  I went and tried to start my car again but it would still not start so I went into the house and got Gail's car keys and started up her car.  It was a sky blue color 1989 model Oldsmobile Cutlass Sierra.  I first started forward and when I went backwards I backed off the concrete and thought I was stuck and I jumped out of the car and run in the garage and went back to the car and backed it on out onto the street and drove off.

The next day, February 8, Etheridge was again interviewed by the police.  During the course of this interview, Etheridge gave a second confession outlining substantially the same course of events that he had revealed to the police the previous day in his written confession.  Specifically, during the course of this second confession, Etheridge denied raping Christie and said he could not remember stabbing either woman.  He did state, however: "I killed a girl."  Etheridge also stated that he had gone to the Chauvieres' house on February 2, alone.

On April 2, 1990, the day before he was indicted for the murder of Christie Chauviere, Etheridge told the police that he wanted to change his story.  Etheridge now told the police that he was not alone when he entered the Chauvieres' house.  Instead, he stated that he was accompanied by a long-time friend who he identified as "Queer Eddie."  It was "Queer Eddie," Etheridge

8

claimed, who had killed Christie. Despite his claims that he had known "Queer Eddie" for approximately 14 years, Etheridge could not remember his last name or his address.

C

On April 3, 1990, Etheridge was indicted by a Brazoria County, Texas Grand Jury on a single-count indictment for the capital murder of Christie Chauviere.[3] Specifically, the indictment charged Etheridge with the murder of Christie Chauviere while in the course of robbing her, sexually assaulting her, kidnaping her, and robbing her mother. The indictment also included four enhancement paragraphs alleging prior felony convictions for theft, burglary, and aggravated assault.

On October 31, 1990, Etheridge was tried for the murder of Christie Chauviere. On November 6, the jury returned a verdict of guilty. The sentencing phase of Etheridge's trial began the next day. Despite Etheridge's present claim that substantial "mitigating evidence" existed, his trial counsel decided not to

---

[3]Texas Penal Code section 19.03(a)(2) provides in relevant part:

Capital Murder.
(a) A person commits an offense if he commits murder under 19.02(b)(1) and:
  .  .  .
  (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnaping, burglary, aggravated sexual assault, a r s o n , o r obstruction or retaliation.

Tex. Penal Code Ann. § 19.03 (Vernon, 1999).

offer any evidence during the sentencing phase of the trial. In accordance with article 37.071 of the Texas Code of Criminal Procedure in 1990, the court submitted two special issues to the jury:

> (1) Was the conduct of the Defendant, Gary Wayne Etheridge, that caused the death of the deceased, Christie Chauviere, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?
>
> (2) Is there a probability that the Defendant, Gary Wayne Etheridge, would commit criminal acts of violence that would constitute a continuing threat to society?

The court then instructed the jury that:

> If you return an affirmative finding on each of the Issues submitted to you, the court shall sentence the defendant to death. You are further instructed that if you return a negative finding on any Issue submitted to you, the court shall sentence the defendant to the penitentiary for life. You are therefore instructed that your answers to the Issues, which determine the punishment to be assessed to the defendant by the court, should be reflective of your finding as to the personal culpability of the defendant, Gary Wayne Etheridge, in this case.

> Finally, the court instructed the jury that it should consider

mitigating evidence as follows:

> You are instructed that when you deliberate on the questions posed in the Issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstance in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability at the

10

time you answer the Issues. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one or more of the Issues under consideration.

On November 8, the jury answered "yes" to both the special issues, and the court sentenced Etheridge to death. On December 10, Etheridge filed a motion for a new trial. On January 21, 1991, after conducting a hearing, the court denied his motion. The next day, Etheridge filed a notice of appeal. On June 22, 1994, the Texas Court of Criminal Appeals affirmed Etheridge's conviction and sentence. See Etheridge v. State, 903 S.W.2d 1, (Tex. Crim. App. 1994). On May 10, 1995, the Court of Criminal Appeals denied his motion for rehearing. On October 10, 1995, the United States Supreme Court denied his petition for certiorari. See Etheridge v. Texas, 516 U.S. 920 (1995).

On April 23, 1997, Etheridge filed his original petition for state habeas relief. This petition was amended two months later on June 18, 1997. On January 6, 1998, the state district court entered findings of fact and conclusion on law. On April 1, 1998, the Texas Court of Criminal Appeals denied Etheridge's application for state habeas relief.

On November 13, 1998, Etheridge filed a petition for federal habeas relief. Three days earlier, on November 10, 1998, Etheridge changed his version of the underlying facts surrounding the murder

of Christie Chauviere for the third time.[4]  Etheridge swore to an affidavit stating that although he was present when Christie was murdered, it was his brother, Mike Etheridge, who killed Christie. The affidavit provided in relevant part:

> On February 2, 1990, my brother Mike Etheridge and I went to the home of Gail Chauviere in Richwood, Texas. . . . When we got inside the house, I asked Gail for an advance on my paycheck, but Gail refused to give me any money.  I told her to be quiet, that I only wanted the money.  We struggled, and I tried to calm her down and put her in the closet so we could take the money and go.  I did stab Gail with a small pocketknife that I kept in my pocket for work.  She grabbed something sharp from the kitchen and cut me on the left hand.
>
> Meanwhile, her daughter, Christie Chauviere, had come out of the bathroom and became hysterical and was screaming.  Mike tried to get her to be quiet.  They were in a different part of the house from where Gail and I were.  I was near the kitchen with Gail and Mike was in the front entrance way with Christie.  I could hear Christie yelling, but I was having a hard time trying to get Gail to quit fighting me. . . .  I then heard Christie stop making noise.  I did not see Mike stab Christie.  I did not stab or cut or hurt or have any sexual contact with Christie in any way.
>
> Once I freed myself from Gail and heard Christie was quiet, I saw Mike standing over Christie in the entrance way.  Mike and I then left through the door in the garage.  I was bleeding from the cut on my hand.  My car would not start, so Mike and I got in Gail's car [and drove away]. . . .

---

[4]Initially, Etheridge told Tanya Ray and the Roenkers that he had stabbed a man in knife fight.  Then he told Officer Day and the Brazoria County police department following his arrest that he had acted alone in killing Christie.  Subsequently, just one day before he was indicted for the murder of Christie Chauviere, he told the police that his "long-time friend 'Queer Eddie'" had killed Christie.  Now, after exhausting all of his direct and state habeas appeals he changed his story for the third time stating that his brother, Mike Etheridge, had killed Christie.

On May 19, 1999, the United States District Court for the Southern District of Texas, Houston Division, denied Etheridge's petition for habeas relief. See Etheridge v. Johnson, 49 F.Supp.2d 963 (S.D.Tex. 1999). On September 10, 1999, Etheridge filed a request for a COA with our court.

II

A

Etheridge seeks a COA on two issues: (1) whether the assistance he received from his state habeas counsel was rendered constitutionally ineffective as a result of his failure to raise a claim of ineffective assistance of trial counsel;[5] and (2) whether the district court's failure to give the jury a special issue on mitigating evidence resulted in a denial of his Equal Protection rights because such an issue was later mandated by statute and given by the court during the trials of other defendants who were charged with committing capital offenses on the same date as Etheridge.

_____

[5]In Etheridge's petition and in his reply brief, he argues that trial counsel was ineffective because he failed to introduce mitigating evidence during the sentencing phase--specifically, that "trial defense counsel failed to present evidence of an emotionally scarred upbringing, abuse by a drunken father, suicide attempts by his mother, a head injury as a child, and drug dependency since adolescence." The failure of habeas counsel to include this claim may be due in part to the fact that trial counsel furnished an affidavit indicating that the failure to put on this "mitigating evidence" was a deliberate choice in trial strategy. See infra note 8. It should be noted that Etheridge's state habeas counsel did raise a claim of ineffective assistance based on trial counsel's failure to use all of his peremptory strikes during voir dire.

13

In determining if a COA should be issued, we first must decide whether Etheridge "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also Drinkard v. Johnson, 97 F.3d 751, 756 (5th Cir. 1996). Etheridge can make such a showing if he "demonstrates that the issues are debatable among jurists of reason; that a court could resolve the issue [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)(citations omitted). In a capital case, "the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate," although the court may consider the nature of the penalty in deciding whether to allow an appeal. Id. at 893.

B

With respect to the first issue, Etheridge argues that he has been denied constitutionally effective counsel because, in the state habeas proceedings, habeas counsel failed to raise a claim of ineffective assistance of trial counsel, based on trial counsel's failure to offer mitigating evidence during the sentencing phase of his trial.

The district court held that because this claim of trial counsel's ineffectiveness had not been raised before the state courts, the federal court could grant no relief until the claim was exhausted in state court. The district court further held, however, that no relief in fact could be granted by the federal

14

courts because of the Texas' abuse of the writ doctrine[6]--an independent and adequate state procedural rule, which bars successive state habeas petitions.

We agree that Etheridge is procedurally barred from raising this unexhausted claim in state courts because of the Texas abuse of the writ doctrine. See Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)(holding that "[I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, [then] there is [a] procedural bar default for purposes of federal habeas [relief]"); Nobles v. Johnson, 127 F.3d 409, 423 (5th Cir. 1997)(stating that the Texas abuse of the writ doctrine represents "an adequate state procedural bar for purposes of federal habeas review"). Thus, for purposes of federal habeas relief, this state

---

[6]See Tex. Code Crim. P. Ann. art. 11.071 § 5 (Vernon Supp. 1999), stating in relevant part:

(a) If an initial application for a writ of habeas corpus is untimely or if a subsequent application is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent or untimely initial application unless the application contains sufficient facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claims was unavailable. . . .

15

procedural bar prevents our considering the merits of this claim absent a showing of "cause for failing to raise the alleged error earlier and suffered prejudice therefrom," or the failure of the court to consider the claim will result in a "fundamental miscarriage of justice." Callins v. Johnson, 89 F.3d 210, 212 (5th Cir. 1996)(citing McCleskey v. Zant, 499 U.S. 467, 493-94 (1991); see also Nobles, 127 F.3d at 423.

Etheridge argues that the ineffectiveness of his state habeas counsel in failing to raise a claim of ineffective assistance of trial counsel constitutes sufficient "cause" for his present inability to raise this claim. Further, Etheridge argues, that if this court does not consider the merits of this claim, he will suffer prejudice because he will be prevented from seeking federal review of his trial counsel's performance, which, if considered by the federal courts, will result in a new sentencing hearing. Ultimately, Etheridge argues, at this new sentencing hearing, the jury will be allowed to consider several pieces of mitigating evidence, which will result in the imposition of a life sentence rather than death. Consequently, because his state habeas counsel failed to raise a claim of ineffective assistance based on trial counsel's failure to introduce this mitigating evidence, Etheridge argues that he has suffered prejudice.[7] Thus, Etheridge argues, he

---

[7]Although Etheridge raises a claim of ineffective trial counsel for failing to introduce mitigating evidence, trial counsel's affidavit reflects that the decision not to introduce such mitigating evidence was a deliberate choice of strategy,

16

has demonstrated sufficient "cause and prejudice" to disregard the

state procedural rule.[8]  Moreover, Etheridge argues in his petition

arrived at after carefully considering that although such evidence
may shed some light on Etheridge's troubled background, it may also
lead the jury to conclude that Etheridge posed a future danger to
society.  Such strategic choices are not likely to provide the
basis for an ineffective assistance of counsel claim.  See Mann v.
Scott, 41 F.3d 968, 984 (5th Cir. 1994)(stating that "strategic
decisions not to introduce evidence . . . [of] a double-edged
nature . . . are granted a heavy measure of deference in a
subsequent habeas attack" and carry a strong presumption that they
were in fact reasonable).  Here, there is nothing in the record to
suggest that trial counsel's choice amounted to ineffectiveness.

[8]Although Etheridge's "cause and prejudice" argument, in its
fullest expression, seems to have been evolving throughout the
briefing process, it is best articulated, with some help from us,
as follows: (1)  Jones was decided incorrectly insofar as it held
that ineffective assistance of habeas counsel cannot serve as
sufficient "cause" for avoiding the state procedural bar; (2) the
incorrect result reached by the Jones court reflects a
misinterpretation of Coleman v. Thompson, 501 U.S. 722 (1991); (3)
Coleman is properly read to suggest that in death penalty cases in
Texas, where the state is statutorily required to provide competent
habeas counsel, see Tex. Code Crim. P. art. 11.071 § 2(a) (Vernon
1999), the petitioner's attorney is not the petitioner's agent;
therefore, the petitioner is no longer responsible for his
counsel's mistakes because the state has assumed the responsibility
for providing competent counsel; (4) because the state--not the
petitioner--must assume the responsibility for counsel's mistakes,
habeas counsel's failures may serve as "cause" for avoiding the
procedural bar when habeas counsel fails to meet the minimal level
of competency; (5) once the plaintiff has been able to establish
that habeas counsel has failed to meet the minimal level of
competence--i.e., sufficient "cause" for invoking the procedural
bar--the petitioner must then establish prejudice resulting from
habeas counsel's failure to raise the barred claim;  (6) with
respect to prejudice, Etheridge argues that if habeas counsel had
raised the claim that trial counsel was ineffective for failing to
introduce mitigating evidence at his sentencing hearing, he would
have received a new sentencing hearing; (7) further, Etheridge
argues that he was ultimately prejudiced by ineffective habeas
counsel because such mitigating evidence introduced at the
sentencing hearing would have resulted in at least one of the
jurors voting to sentence him to life, instead of death.
Therefore, Etheridge argues, the procedural bar based on the Texas

17

that a "fundamental miscarriage of justice" will occur if he cannot

_____

abuse of the writ doctrine can be avoided by this demonstration of cause and prejudice.

Key to Etheridge's argument is his particular interpretation of the following passage in Coleman:

> Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the State, which is responsible for the denial of a constitutional matter, must bear the cost of any resulting default and the harm to state interests that federal habeas relief entails. A different allocation of costs is appropriate in those circumstances where the State has no responsibility to ensure that the petitioner was represented by competent counsel. As between the State and the petitioner, it is the petitioner who must bear the burden of a failure to follow state procedural rules.

Coleman, 501 U.S. at 754. As noted above in this footnote, Etheridge argues that because the state of Texas has assumed a responsibility to provide habeas counsel, it must bear the cost of any resulting default by such counsel, which here is the opportunity to raise the defaulted claim in this federal habeas proceeding.

The respondent, on the other hand, rejects this interpretation of Coleman. Essentially, the respondent argues that the word "constitutional" is implied when referring to the responsibility of the state to provide competent counsel. The respondent thus reads the sentence in the quotation from Coleman above as follows: "A different allocation of costs is appropriate in those circumstances where the State has no [constitutional] responsibility to ensure that the petitioner was represented by competent counsel." See Coleman, 501 U.S. at 754. The respondent therefore argues that, because Etheridge does not have a constitutionally protected right to counsel in state habeas proceedings, Etheridge must bear the cost of all procedural defaults.

We do not suggest that the framework of Etheridge's argument is implausible. We are, however, precedent bound to reject this analysis. See Jones, 171 F.3d at 270; Callins v. Johnson, 89 F.3d 210 (5th Cir. 1996). Furthermore, as we have indicated, Etheridge has provided no evidence that would suggest that counsel's strategic choices of introducing no mitigating evidence was not a professionally acceptable judgment call. See Mann, 41 F.3d at 984. Finally, it is pure speculation that a new hearing would result in a different result.

18

present this claim because he is actually innocent of the murder of Christie Chauviere.[9]

In Jones v. Johnson, 171 F.3d 270 (5th Cir. 1999), we had an opportunity to consider whether the ineffective assistance of state habeas counsel could constitute sufficient "cause" to avoid a state procedural bar. Id. at 276. The petitioner there alleged that "his state habeas counsel rendered ineffective assistance by failing to raise the issue of his trial counsel's ineffectiveness." Id. at 276. As an initial matter, the court stated:

> Jones did not present this claim for review on either direct appeal or during the state habeas proceedings, and this unexhausted claim is therefore procedurally barred. Further, Jones' claim would be dismissed as abuse of the writ under state law if presented in a second state petition and is likewise barred from our consideration. Jones must therefore assert cause and prejudice for not bringing these claims in his first state application or be procedurally barred.

Id. at 276-77 (citing Coleman v. Thompson, 501 U.S. 722 (1991)).

Focusing on the issue of "cause," the court held that attorney error in a state habeas proceeding could not constitute sufficient

---

[9]We need not address the "fundamental miscarriage of justice" exception to the independent and adequate state procedural bar. Although Etheridge has made this claim in his petition, his counsel at oral argument recognized the lack of evidentiary support for it in the record. Etheridge, however, did submit his own affidavit in the federal habeas proceedings in which he stated that his brother murdered Christie Chauviere while Etheridge was restraining Gail in another part of the Chauvieres' house. This statement, however, reflects at least Etheridge's fourth version of his involvement in the murder of Christie Chauviere, and as we have indicated is not supported by any other evidence.

cause for avoiding the adequate and independent state procedural bar:

> Jones contends that his state habeas counsel's failure to present his ineffective assistance claim during state habeas proceedings constitutes cause sufficient to overcome procedural default. The law is well-established, however, that such error committed in a post-conviction application, where there is no constitutional right to counsel, cannot constitute cause. Jones' contention is thus without merit.

Id. at 277 (citations omitted); see also Callins v. Johnson, 89 F.3d 210 (5th Cir. 1996)(stating that state habeas "counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation and [since] there is no constitutional right to counsel in habeas proceedings . . . no error by habeas counsel can ever constitute cause for abusing the writ").

Thus, our precedent is clear that the failure of Etheridge's state habeas counsel to raise the issue of the ineffectiveness of trial counsel cannot constitute "cause" sufficient to escape the procedural default of this claim. Accordingly, the claim is procedurally barred from our consideration.

C

Turning to Etheridge's equal protection claim, Etheridge points out that he was not entitled to the benefit of a mitigating instruction provided by a recently enacted Texas statute; yet, other defendants, who were charged with committing capital crimes on the same date as his crime, but who were tried after him, are entitled to the instruction. This circumstance, he says, denies

20

him the Fourteenth Amendment right to equal protection of the law. With respect to his right at stake, Etheridge contends that because "there is no personal right so fundamental as the right to life," the state's legislative restriction placed on the benefit of this statutory instruction must pass strict scrutiny.[10] Consequently, Etheridge argues, because the limitation cannot pass strict scrutiny, it is unconstitutional.

Shortly after Etheridge was sentenced to death, the Texas Legislature, in 1991, amended the capital sentencing procedure to include a special issue explicitly requiring the jury to consider any mitigating circumstances against imposing the death penalty. See Tex. Code Crim. P. Ann. art. 37.071. The new special issue required the jury to consider the following question if they had answered affirmatively to the first two issues of "deliberateness" and "future danger to society":

> Whether, taking into consideration all of the evidence including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life rather than a death sentence be imposed.

---

[10]Etheridge understandably fails to identify any specific provision of the Constitution that assures a fundamental right to life. See Richard v. Hinson, 70 F.3d 415, 417 (5th Cir. 1995)(stating that "a fundamental right for equal protection purposes is one that is explicitly or implicitly protected by the Constitution"). Rather, he simply asserts in his brief that "there is no personal right so fundamental as the right to life." Actually, the Constitution only guarantees fundamental due process before one's life may be taken by the state.

21

Tex. Code Crim. P. Ann. art. 37.071 § 2(e)(Vernon 1992).  This change in procedure was initially limited to those offenses that were committed on or after September 1, 1991.  Id.  at § 5(a).  However, in 1993, the Texas Legislature further amended the procedure  to require that the special issue be given in all capital cases "whether committed before, on, or after the effective date of this Act [August 30, 1993]."  Tex. Code Crim. P. Ann. art. 37.071 (Vernon 1994).  Additionally, a specific provision was adopted that expressly required that the special issue be given in all capital cases for offenses committed before September 1, 1991, that came to trial on or after September 1, 1993, either for the first time or on re-trial after the granting of a new trial or punishment hearing.  Tex. Code. Crim. P. Ann. art. 37.0711 (Vernon 1994).

As a result of these amendments, defendants who committed their offenses before September 1, 1991, and were tried for those offenses before September 1, 1993, did not receive the benefit of the special mitigating instruction.  Etheridge's trial fell within this gap.

We agree with Etheridge that the equal protection clause is "essentially a mandate that all persons similarly situated must be treated alike;" however, under the equal protection clause, courts apply "different standards of review depending upon the right or classification implicated."  Rolf v. City of San Antonio, 77 F.3d 823, 828 (5th Cir. 1996).  If a statute disadvantages a suspect

22

class, or if it impinges upon a fundamental right, the statute is subject to strict scrutiny.  Id.  Otherwise, courts apply the less stringent rational basis test to determine if the statute passes constitutional muster.  Id.

Etheridge argues that articles 37.071 and 37.0711 are subject to strict scrutiny because his fundamental right to life is impinged by the denial of the additional instruction.  The statutes in question do not address so broad a concern.  Instead, these statutes address the procedure by which the state may take a life, and thus implicates Etheridge's right to certain procedures in death penalty cases.  The question is whether the denial of the benefit of these procedures to Etheridge impinges some fundamental right to which he is entitled.  If they do, then we will have to determine whether the state can advance a compelling interest in these laws; if they do not, then the state must only demonstrate a rational basis to justify these laws that effectively exclude Etheridge from their coverage.

On numerous occasions, the Supreme Court has held that the Texas sentencing procedure in place prior to 1993 satisfies the fundamental constitutional right to due process of law in death penalty cases.[11]  See Johnson v. Texas, 509 U.S. 350 (1993); Graham

---

[11]In Lackey v. Scott, 28 F.3d 486 (5th Cir. 1994), we addressed a constitutional challenge to the exact jury charge given in Etheridge.  The defendant requested a separate jury instruction on mitigation.  Id. at 488.  The state trial court denied this request.  Id. On federal habeas review, the defendant agreed that "without the requested [mitigation] instruction, the Texas special

23

v. Collins, 506 U.S. 461 (1993); Franklin v. Lynaugh, 487 U.S. 164 (1988); Jurek v. Texas, 428 U.S. 262 (1976). Consequently, because the pre-amendment procedure afforded Etheridge all of the due process rights to which he was constitutionally entitled, the denial of the additional instruction does not result in the denial of a fundamental due process right. Thus, Etheridge cannot assert the right to have his equal protection claim, challenging articles 37.071 and 37.0711, judged under a strict scrutiny test. We will, therefore, review Etheridge's equal protection claim under the rational basis test. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440 (1985); Rolf, 77 F.3d at 828.

As the district court noted, the applicability of Article 37.0711 was limited to "new trials or new sentencing hearings--circumstances in which a court has reopened a judgment--and article 37.01 to new offenses." Etheridge, 49 F.Supp.2d at 991. Clearly, Texas has a legitimate interest in providing persons tried in the future with additional procedural rights. On the other hand, the State of Texas has a legitimate interest in "the finality of convictions that have survived direct review within the state court system." See Etheridge, 49 F.Supp.2d at 991 (quoting Brecht v.

---

issues did not allow the jury to give mitigating effect to the evidence." Id. We rejected this argument stating: "We have previously stated that the Texas sentencing scheme does not preclude the jury from giving mitigating effect to evidence. . . ." Id. at 489. Thus, Lackey makes it clear that the Texas special issues provided Etheridge with constitutionally adequate protection.

24

<u>Abrahamson</u>, 507 U.S. 619 (1993)).  Thus, because articles 37.071 and 37.0711 have a rational basis for their enactment, we hold that these statutes pass constitutional scrutiny under the Equal Protection Clause.

III

In sum, Etheridge has failed to make a substantial showing of the denial of any constitutional right. Thus, his request for a COA is DENIED, and the appeal is DISMISSED.

DENIED and DISMISSED.